Appeal No. 2015-1017

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

PROLITEC, INC.,

Appellant,

v.

SCENTAIR TECHNOLOGIES, INC.,

Appellee.

**Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
in No. IPR2013-00180**

## OPENING BRIEF OF APPELLANT PROLITEC, INC.

CORY C. BELL
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Two Seaport Lane
6th Floor
Boston, MA 02210
(617) 646-1641

ERIKA H. ARNER
J. DEREK MCCORQUINDALE
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700

January 14, 2015

*Attorneys for Appellant Prolitec, Inc.*

## CERTIFICATE OF INTEREST

Counsel for Appellant Prolitec, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Prolitec, Inc.

2.     The name of the real party in interest represented by me is:

Prolitec, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

None

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
Erika H. Arner
J. Derek McCorquindale
Cory C. Bell

GODFREY & KAHN, S.C.
Jennifer L. Gregor
James D. Peterson
Nicholas A. Kees
Anthony Baish
Andrew Landsman

# TABLE OF CONTENTS

I.  STATEMENT OF JURISDICTION ......................................................1

II. STATEMENT OF THE CASE ...........................................................1

III. STATEMENT OF THE ISSUE .........................................................3

IV. STATEMENT OF FACTS ................................................................3

    A.    The Patented Invention: A New Way to Control Diffusion
           Appliances ...............................................................................3

    B.    The '068 Patent Claims .........................................................5

    C.    ScentAir's Infringement of the '068 Patent .........................7

    D.    *Inter Partes* Review Proceeding before the USPTO ...........7

           1.    Prior Art Involved in Proceeding ................................8

                a.    U.S. Patent 6,712,287 ("Le Pesant") ...............8

                b.    PCT International Publication No. WO
                      96/23530 ("Privas") ........................................9

           2.    ScentAir's IPR Petition ............................................10

                a.    The Petition Asserted that Le Pesant Teaches
                      the Claimed "Control Schemes" Because It has
                      Programmable Electronics .............................10

                b.    The Petition Relied Upon Privas for "Control
                      Schemes Associated with Volume" ...............11

            3.    PTAB Decision on Institution ..................................11

            4.    Prolitec's Patent Owner Response ...........................12

                a.    Prolitec Noted that All Parties Agree the
                      Claims Require a Plurality of Control Schemes .............12

b.    Prolitec Argued that the Petition Overlooked the Claimed "Plurality of Control Schemes" Associated with Different Volumes ...............................12

5.    ScentAir's Reply .........................................................14

6.    PTAB's Final Written Decision...................................14

a.    PTAB's New Claim Construction Based on New Evidence ...................................................14

b.    The PTAB Rejected ScentAir's Contention that Le Pesant Alone Renders the Claims Obvious Because Le Pesant Does not Disclose Adjusting its Programming for Various Room Volumes or Selecting a Program based on Room Volume................15

c.    The PTAB Found that the Combination of Le Pesant and Privas Rendered the Claims Obvious...........................................................16

V.    SUMMARY OF ARGUMENT....................................................18

VI.    ARGUMENT.............................................................................20

A.    Standards of Review...........................................................20

B.    The PTAB Erred Because the Combination of Le Pesant and Privas Fails to Render the Claims Obvious.........................................20

1.    The PTAB's Final Written Decision Should be Reversed Because It Failed to Ascertain the Differences between the Claims and the Cited Art Regarding "A Plurality of Control Schemes"...........................22

a.    The PTAB Relied Upon Le Pesant to Teach the Claimed Plurality of Control Schemes, But It Did Not .........................................................22

b.    The Final Written Decision Must Rely Upon Privas for the Claimed Volume Based Selection of a Control Scheme, But It Cannot ................27

2.      The Combination of References Fails to Teach the
        PTAB's Construction of "a Plurality of Control
        Schemes" .................................................................................. 31

3.      The Irreconcilable Purposes of the References'
        Programs Render the Programs Uncombinable ........................ 32

4.      The Record and the PTAB's Unappealed Factual
        Findings Contradict the Only Reason to Combine .................. 34

VII.  CONCLUSION ............................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Apple Computer, Inc.*, *v. Articulate, Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) .............................................................21

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  365 U.S. 336 (1961).......................................................................21

*Belkin Int'l, Inc. v. Kappos*,
  696 F.3d 1379 (Fed. Cir. 2012) ........................................................20

*Gen. Foods Corp. v. Studiengeesellschaft Kohle mb H*,
  972 F.2d 1272 (Fed. Cir. 1992) .........................................................21

*In re Gleave*,
  560 F.3d 1331 (Fed. Cir. 2009) .........................................................20

*In re Gordon*,
  733 F.2d 900 (Fed. Cir. 1984) ....................................................32, 34

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966).............................................................................21

*Hughes Aircraft Co. v. United States*,
  215 USPQ 787 (Ct. Cl. Trial Div. 1982), *aff'd in part*, *rev'd in part*,
  717 F.2d 1351 (Fed. Cir. 1983) .........................................................34

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) ....................................................34, 36

*In re Kotzab*,
  217 F.3d 1365 (Fed. Cir. 2000) .........................................................20

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) .........................................................21

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    744 F.3d 1272 (Fed. Cir. 2014) ...........................................................20

*In re Mettke*,
    570 F.3d 1356 (Fed. Cir. 2009) ...........................................................20

*Mullins v. U.S. Dep't of Energy*,
    50 F.3d 990 (Fed. Cir. 1995) ...............................................21, 25, 26

*On-Line Careline, Inc. v. Am. Online, Inc.*,
    229 F.3d 1080 (Fed. Cir. 2000) ............................................29, 30, 31

*Schenck v. Nortron Corp.*,
    713 F.2d 782 (Fed. Cir. 1983) ........................................25, 27, 31, 32

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir. 1983) ......................................25, 27, 31, 32

**Federal Statutes**

5 U.S.C. § 7060 ....................................................................................1

28 U.S.C. § 1295 ..................................................................................1

35 U.S.C. § 103 .....................................................................10, 12, 20

35 U.S.C. § 318 ....................................................................................1

35 U.S.C. § 319 ....................................................................................1

Administrative Procedure Act ............................................................21

**Regulations**

37 C.F.R. § 42.73 .................................................................................1

37 C.F.R. § 90.3 ...................................................................................1

## STATEMENT OF RELATED CASES

No other appeal from this *inter partes* review of U.S. Patent No. 7,930,068 ("the '068 patent") was previously before this or any other appellate court. Another case between the same parties involving U.S. Patent No. 7,712,683 B2 ("the '683 patent") was the subject of a separate *inter partes* review and is currently on appeal in 2015-1020.

Prolitec, Inc., on May 15, 2012, brought an infringement suit against ScentAir Technologies, Inc. in the United States District Court for the Eastern District of Wisconsin, based in part on the '068 patent. *Prolitec, Inc. v. ScentAir Techs., Inc.*, No. 2:12-cv-483-RTR (E.D. Wisc.). Pursuant to an unopposed motion, on May 17, 2013, the district court stayed proceedings pending the *inter partes* reviews of the '683 and '068 patents before the Patent Trial and Appeal Board ("PTAB"). That stayed proceeding may be directly affected by this Court's decision in the current appeal.

## I.    STATEMENT OF JURISDICTION

This appeal arises from the July 18, 2014, final written decision of the Patent Trial and Appeal Board ("PTAB") pursuant to 35 U.S.C. § 318 and 37 C.F.R. § 42.73 in *inter partes* review ("IPR") No. IPR2013-00180. A1. Prolitec, Inc. ("Prolitec") filed its notice of appeal on August 22, 2014, within the time required by 37 C.F.R. § 90.3(a)(1). This court has exclusive jurisdiction over Prolitec's appeal of the PTAB's Final Written Decision in this IPR under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 319.

## II.    STATEMENT OF THE CASE

Patent Owner Prolitec appeals the final determination of the PTAB holding the challenged claims of U.S. Patent No. 7,930,068 ("the '068 patent") unpatentable. *See* A1268-73. The PTAB's decision was arbitrary, capricious, an abuse of discretion, and not in accordance with law. *See* 5 U.S.C. § 706(2).

Patent Owner Prolitec, a Wisconsin research and development company, specializes in liquid-diffusion technologies and was an early leader in the emerging field of olfactory advertising and marketing. A1267. Prolitec's products are "widely used for the diffusion of fragrances for odor control and the creation of ambiance," and frequently deployed in large areas such as hotel lobbies, casinos, fitness centers, theaters, convention centers, and retail stores. *Id*.

In the course of its business, Prolitec found that conventional approaches for controlling scent diffusion devices—which often contained complex control systems of sensors—were problematic. A38, 1:18-40. For example, conventional control systems often included sensors located apart from the diffusion device. A38, 1:23-25. Connecting the sensors and the diffusion device could be undesirable and inappropriate in some circumstances, such as when the device is not permanently mounted or installed. A38, 1:25-29. To address these problems, Prolitec designed a new control system for scent diffusion devices and patented it the '068 patent.

The primary reference relied upon in this appeal is U.S. Patent 6,712,287 ("Le Pesant"). The PTAB originally instituted *inter partes* review on a ground that Le Pesant alone rendered the challenged claims obvious. *See infra* § IV.D.2.a. In the Final Written Decision, however, the PTAB found that Le Pesant failed to render the claims obvious because it "does not disclose adjusting its programming for various room volumes or selecting a program based on room volume." *See infra* § IV.D.6.b.  ScentAir did not appeal that decision. *Id*.

Despite that deficiency, the Final Written Decision erroneously concluded that combining the disclosure of an English translation of PCT International Publication No. WO 96/23530 ("Privas") with Le Pesant rendered the challenged claims obvious. The Final Written Decision, however, did not properly apply the

2

law of obviousness. *See infra* §§ VI.B.  Instead, it relied upon conclusory statements without pointing to support for the conclusions in the record and without considering the claims or prior art as a whole.

## III.  STATEMENT OF THE ISSUE

Did the PTAB err in finding the challenged claims of the '068 patent—which recite an appliance with a plurality of selectable control schemes corresponding to particular volumes of a room to be scented—obvious over the combined disclosures of an appliance that can be programmed by a user for different purposes, such as an alarm clock or quitting smoking, and an appliance with a program that uses a variable from a lookup table to control the appliance to keep the odor level constant?

## IV.  STATEMENT OF FACTS

### A.    The Patented Invention: A New Way to Control Diffusion Appliances

The '068 patent discloses an improved way to control and operate diffusion devices using an appliance programmed to operate according to a variety of control schemes. A27, Abstract; A38, 1:39-40. For example, a user of the improved appliance may use a dial to select among different control schemes to control how the appliance diffuses scent based on parameters such as the size of a room to be scented or the type of scent to be diffused. A39, 3:61-4:5.

Figure 4 of the patent shows an example of a table of control schemes; each line of the table is a control scheme associated with a dial position 111. *Id*.

FIG. 4

| 54 Room Vol (cft) | 111 Dial (DS) | NSU Output (ml/hr) | 112 Speed (%PWM) | 114 Ton (Sec) | Ton (min) | 116 Toff (Sec) | Toff (min) | 118 Duty cycle (% on) | Avg Consump (ml/hr) | Monthly usage (ml) | 120 Cartridge life (weeks) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80 | 1 | | | | | | | | | | 150 | 110 |
| 160 | 2 | | | | | | | | | | 102 | |
| 240 | 3 | | | | | | | | | | 80 | |
| 320 | 4 | | | | | | | | | | 66 | |
| 400 | 5 | | | | | | | | | | 56 | |
| 480 | 6 | | | | | | | | | | 49 | |
| 560 | 7 | | | | | | | | | | 35 | |
| 640 | 8 | | | | | | | | | | 31 | |
| 720 | 9 | | | | | | | | | | 28 | |
| 880 | 10 | | | | | | | | | | 26 | |
| 1040 | 11 | | | | | | | | | | 24 | |
| 1200 | 12 | | | | | | | | | | 22 | |
| 1360 | 13 | | | | | | | | | | 20 | |
| 1710 | 14 | | | | | | | | | | 16 | |
| 1890 | 15 | | | | | | | | | | 15 | |
| 2070 | 16 | | | | | | | | | | 14 | |
| 2250 | 17 | | | | | | | | | | 13 | |
| 2430 | 18 | | | | | | | | | | 13 | |
| 2610 | 19 | | | | | | | | | | 12 | |
| 2880 | 20 | | | | | | | | | | 11 | |
| 3060 | 21 | | | | | | | | | | 9.5 | |
| 3240 | 22 | | | | | | | | | | 9.1 | |
| 3420 | 23 | | | | | | | | | | 8.7 | |
| 3600 | 24 | | | | | | | | | | 8.4 | |
| 3780 | 25 | | | | | | | | | | 8.0 | |
| 3950 | 26 | | | | | | | | | | 7.7 | 110 |
| 4140 | 27 | | | | | | | | | | 7.5 | |
| 4320 | 28 | | | | | | | | | | 6.4 | |
| 4500 | 29 | | | | | | | | | | 6.2 | |
| 4680 | 30 | | | | | | | | | | 6.0 | |
| 4950 | 31 | | | | | | | | | | 5.8 | |
| 5130 | 32 | | | | | | | | | | 5.6 | |
| 5310 | 33 | | | | | | | | | | 5.5 | |
| 5490 | 34 | | | | | | | | | | 5.3 | |
| 5670 | 35 | | | | | | | | | | 4.6 | |
| 5850 | 36 | | | | | | | | | | 4.5 | |
| 6030 | 37 | | | | | | | | | | 4.4 | |
| 6900 | 38 | | | | | | | | | | 4.2 | |
| 7100 | 39 | | | | | | | | | | 4.1 | |
| 7300 | 40 | | | | | | | | | | 4.0 | |
| 7500 | 41 | | | | | | | | | | 4.0 | 110 |
| | 42 | | | | | | | | 100.0% | | | 2.2 | |
| | 43 | | | | | | | | 100.0% | | | 1.8 | |
| | 44 | | | | | | | | 100.0% | | | 1.6 | |
| | 45 | | | | | | | | 100.0% | | | 1.3 | |
| | 46 | | | | | | | | 100.0% | | | 1.1 | |
| | 47 | | | | | | | | 100.0% | | | 1.0 | |

Each control scheme specifies a flow rate, or speed (112), for scent to be diffused and timing information for the appliance to be turned on and off (114, 116, 118) in order to operate the appliance in rooms with different volumes. A39, 4:22-29. A user selects the correct control scheme by turning a dial to the position associated with the volume of the treated space. *Id.* Based on the selected control scheme, the appliance controls the diffusion means to treat the space with the desired amount of

4

scent over the desired time. A27, Abstract. In other words, "the '068 patent teaches a device with a user-selectable set of programs (i.e., control schemes), not just a device with programmable settings." A1225, ¶ 59.

Providing multiple control schemes simplifies a liquid diffusion device's configuration because the user can simply select the needed control scheme based on the volume of the space to be scented. *Id.* Thus, the patented control schemes create a useful framework for managing and applying the numerous variables involved in liquid diffusion in large spaces. A1102; A1209, ¶ 32, A1211, ¶ 37.

## B.   The '068 Patent Claims

This appeal involves claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33, with claims 1 and 24 being independent. Claim 1, with relevant language highlighted, recites:

> 1. A method of controlling a liquid diffusion appliance comprising:
>
> providing an enclosed space to be treated by a liquid and with which the appliance is in fluid communication, the appliance including a reservoir of liquid and a means of diffusing the liquid into the air of the space;
>
> *providing a plurality of control schemes for the appliance which based on characteristics of the liquid and a level of treatment desired for the space, each of the control schemes specifying operational parameters for the appliance including a flow rate of liquid, and a periodic timing of operation of the diffusion means;*
>
> providing the diffusion means including a venturi in fluid communication with the liquid reservoir, and the venturi

5

in fluid communication with a source of compressed gas, and wherein operation of the diffusion means comprises release of the pressurized gas into the venturi, the release of the gas into the venturi operating to draw liquid from the reservoir into the venturi where the liquid mixes with the gas at the desired flow rate and then dispersing the gas and liquid mixture into the space;

determining a volume of the space to be treated; and

*selecting one of the control schemes based on the volume of the space to be treated;*

operating the appliance based on the selected control scheme.

A42, 9:19-44 (emphasis added).

Claim 24, with relevant language highlighted, recites:

24. A system for treating an enclosed space with a liquid, the system comprising:

an appliance with a diffusion means in fluid communication with the space and also connected to a liquid reservoir containing the liquid to be dispersed;

the diffusion means including a venturi in fluid communication with the liquid reservoir, and the venturi in fluid communication with a source of compressed gas, and wherein operation of the diffusion means comprises release of the pressurized gas into the venturi, the release of the gas into the venturi operating to draw liquid from the reservoir into the venturi where the liquid mixes with the gas at a desired flow rate and the dispersing the gas and liquid mixture into the space; and,

a controller connected to the appliance, *the controller including a plurality of control schemes for dispersion of the liquid into the space, each control scheme defining operational parameters for the appliance including a periodic operation of the diffusion means and the flow*

6

> *rate of liquid from the reservoir through the diffusion*
> *means, each of the control schemes corresponding to a*
> *particular volume within the space.*

A42-43, 10:66-11:20 (emphasis added).

### C.    ScentAir's Infringement of the '068 Patent

Prolitec discovered that a competitor, ScentAir, was using Prolitec's

patented scent diffusion systems and filed suit for infringement of the '068 patent

and others. *Prolitec, Inc. v. ScentAir Techs., Inc.*, No. 2:12-cv-483-RTR (E.D.

Wisc.). In response, ScentAir filed a petition for *inter partes* review and the

District Court stayed the litigation. *See* A1000.

### D.    *Inter Partes* Review Proceeding before the USPTO

ScentAir's petition for IPR challenged the patentability of claims 1, 3-5, 9-

13, 15, 22-24, 26, 28, and 33 of the '068 patent on twenty-four grounds. A1063;

A1107. The PTAB denied most of ScentAir's challenges, instituting trial on only

two potential grounds of unpatentability, one of which was later rejected by the

PTAB:

- Claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 as unpatentable under 35 U.S.C. § 103(a) as obvious over U.S. Patent No. 6,712,287 to Le Pesant (rejected by the PTAB after trial); and

- Claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 are unpatentable under 35 U.S.C. § 103(a) as obvious over Le Pesant and PCT International Publication No. WO 96/23530 to Privas.

A1082.

1.    **Prior Art Involved in Proceeding**

a.    **U.S. Patent 6,712,287 ("Le Pesant")**

The grounds instituted by the PTAB rely upon Le Pesant as the primary

reference. A1003, A1082. Le Pesant discloses a programmable device that emits

olfactory peaks in several applications, such as in an alarm clock or as part of a

smoking cessation program. A1180; A1191-92. The device of Le Pesant includes a

programmable control device for establishing (i) odor peak emission cycles and

(ii) a predetermined interval between two successive emission cycles. A1180,

Abstract. Le Pesant states that "the purpose of the invention involves renewing

cyclically the olfactory perception of the users by taking their neurosensory

characteristics into consideration." A1185, 2:15-17. In other words, as Dr. Timothy

A. Shedd, Prolitec's expert, testified to the PTAB, "the problem that is addressed

by Le Pesant is the 'phenomena of olfactory habituation,' [A1185, 2:21], also

known as scent fatigue or olfactory adaptation." A1213 ¶ 41.

Le Pesant describes different use cases for its odor-peak emitter. These use

cases include a sleep aid, an alarm clock, coma therapy, anti-smoking aid, games,

education, or scientific research. A1191-92. One example in Le Pesant describes a

program for an alarm clock that emits a scent in odor peaks. If the scent is

insufficient to wake the user, a noise alarm may be set off as well. A1191, 13:40-

14:39. The other examples are similar, but tailored to other uses, such as the use of

odor peaks to awaken a medical patient from a comatose state. A1191-92, 14:40-15:5. Le Pesant discloses several examples of how the device can be "programmed" for the various use cases because, as Dr. Shedd explained, the odor-peak emitter of Le Pesant is not "a device with a user-selectable set of programs." A1191-92. Dr. Shedd testified that Le Pesant is directed to a "programmable product diffusion device" or a "programmable device," A1219-22, ¶ 53-55, that is "more akin to the programming capability of a programmable alarm clock or a programmable coffee maker than the control schemes of the '068 patent." A1220, ¶ 54.

### b. PCT International Publication No. WO 96/23530 ("Privas")

The PTAB's grounds also relied upon a secondary reference, Privas. A1003; A1007. Privas describes a liquid diffusion appliance that maintained a constant level of odor to fumigate indoor spaces such as office spaces, public places, or hotels, with fluid products such as deodorizers, fragrances, or insecticides. *See* A1153; A1156; A1165. The fumigating device of Privas includes a program to control the frequency of spray applications. A1166. "The set point for the frequency may be computed as a result of a set of active parameters." *Id*. In one embodiment, the microprocessor's programming incorporates a set point value that corresponds to the mean value representing air circulation inside the treated indoor area. A1168. The device could measure the set point using an aeraulic probe, *id*.,

or, in one embodiment, the set point value may be "determined by the volume and the nature" of the treated indoor area using a lookup table provided with the device, *id*. The purpose of adjusting the spraying frequency is to allow the fumigating device can maintain a constant level of odor in the indoor space treated. A1156. Indeed, Dr. Shedd testified that maintaining a constant level of odor is the problem the Privas device was designed to address. A1216, ¶ 46.

### 2.    ScentAir's IPR Petition

Of the 24 grounds proposed in ScentAir's IPR petition, only the combination of Le Pesant and Privas is involved in this appeal because the PTAB ultimately found that ScentAir failed to establish that Le Pesant alone rendered the claims obvious, and ScentAir did not appeal that finding. A25.

### a.    The Petition Asserted that Le Pesant Teaches the Claimed "Control Schemes" Because It has Programmable Electronics

Each of the independent claims recites an appliance with a plurality of control schemes. Claim 1 recites

> [a] method of controlling a liquid diffusion appliance comprising . . . providing a plurality of control schemes for the appliance which based on characteristics of the liquid and a level of treatment desired for the space, each of the control schemes specifying operational parameters for the appliance including a flow rate of liquid, and a periodic timing of operation of the diffusion means . . .

A42, 9:19-30.

Claim 24 recites

> a controller connected to the appliance, the controller including a plurality of control schemes for dispersion of the liquid into the space, each control scheme defining operational parameters for the appliance including a periodic operation of the diffusion means and the flow rate of liquid from the reservoir through the diffusion means . . .

A43.

In its IPR petition, ScentAir asserted that Le Pesant discloses these features because it contains "control electronics' programmed to establish odour peak emission cycles." A1016 (citing A1188, 7:40-46; A1190, 11:15-20; A1191, 13:1-6; A1184, A1187 Figs. 7, 2); Abstract of Le Pesant).

### b.     The Petition Relied Upon Privas for "Control Schemes Associated with Volume"

The Petition conceded that Le Pesant does not describe selecting one of a plurality of control schemes based on a volume of the space to be treated, as recited in both independent claims ("selecting one of the control schemes based on the volume of the space to be treated," in claim 1; and "each of the control schemes corresponding to a particular volume within the space," in claim 24). A1020-21. The Petition argued that Privas discloses these features because it disclosed a "set point value" that represented air circulation inside an indoor area and that value may be approximated using the volume and nature of the area. A1029.

### 3.     PTAB Decision on Institution

The PTAB instituted trial on two potential grounds of unpatentability:

- Claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 as unpatentable under 35 U.S.C. § 103(a) as obvious over Le Pesant (later rejected by the PTAB after trial); and

- Claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 are unpatentable under 35 U.S.C. § 103(a) as obvious over Le Pesant and Privas.

The PTAB denied all other proposed grounds. A1082. In adopting the two

obviousness grounds, the PTAB relied exclusively on testimony from ScentAir's

petition to "support the combination and a conclusion of obviousness." A1081.

### 4.    Prolitec's Patent Owner Response

#### a.    Prolitec Noted that All Parties Agree the Claims Require a Plurality of Control Schemes

The parties agree that "plurality of control schemes" means "more than one

control scheme." A1255. Dr. Shedd explained that each control scheme included

"a set of operational parameters for the appliance" based on the context of the

claims and the '068 specification. A1211, ¶ 37. Neither the Petition nor the

Decision on Institution provided a construction for this phrase. *See* A1000-64,

A1065-83.

#### b.    Prolitec Argued that the Petition Overlooked the Claimed "Plurality of Control Schemes" Associated with Different Volumes

Prolitec explained that the Petition mentioned programmable appliances, but

not appliances that included a "plurality of control schemes" as required by all of

the claims. A1088. Specifically, Prolitec explained that the patented control

process provides the user with a "plurality of control schemes," each control

scheme specifying a set of operational parameters for the appliance—not just an appliance that could be programmed. *Id.* Prolitec also explained the benefit of this distinction: providing multiple control schemes makes it easy for the user to manage the multiple variables that affect the performance of a liquid diffusion device. *Id.*; A1209, ¶ 32; A1211, ¶ 37. From the "plurality of control schemes" provided by the patented appliance, the user selects one control scheme based on the volume of the space to be scented, and the other variables are determined by the chosen control scheme. A1088. Prolitec submitted expert evidence from Dr. Timothy A. Shedd that "[t]he '068 patent thus contributes a useful conceptual framework for managing and applying the numerous variables involved in liquid diffusion in spaces large and small in an elegant solution that is easy to understand and use by the end-users of the devices." A1209, ¶ 32.

Prolitec explained that Le Pesant merely teaches a user programmable device, A1102, supported by testimony from Dr. Shedd that Le Pesant's control electronics and associated program are simple programmable electronics. A1102; A1219-21, ¶¶ 53-54. He noted that Le Pesant describes different use case applications, the first being alarm clock applications. *See id.*; A1191-92, 13:35- 15:5. Indeed, Dr. Shedd concluded that the "programmable nature of Le Pesant is more akin to the programming capability of a programmable alarm clock or a

programmable coffee maker than the control schemes of the '068 patent." A1220-21, ¶ 54.

### 5.     ScentAir's Reply

In Reply, ScentAir did not contest the claim construction of control scheme presented by Prolitec or that the claims required multiple control schemes. *See* A1130-50. Instead, Scent Air presented a new theory—now pointing to a passage in Le Pesant relating to memory including "particular parameter set-up and user programming data for the performance of various sequences to activate combinations of drop diffusion means 4." A1138. ScentAir asserted that these "various sequences" related to different applications the Le Pesant appliance could be programmed to perform, such as the alarm clock or quitting smoking examples. A1138-39. The Reply then concluded that a device that could be programmed to perform "various sequences" discloses a plurality of control schemes. *Id.*

### 6.     PTAB's Final Written Decision

#### a.     PTAB's New Claim Construction Based on New Evidence

In its Final Written Decision, the PTAB agreed that the claim language required the control schemes to include a set of operational parameters for the appliance. A8-9. The PTAB, however, also "found it helpful" to provide an explicate construction of a plurality of control schemes beyond the claims' requirement that each control scheme comprises operational parameters. A6. The

14

PTAB construed "a plurality of control schemes" to mean "a system of correlations between particular inputs and particular outputs for controlling the diffusion means, which permits a user to select a particular correlation based on user criteria." A9. The PTAB based this construction on its understanding of "a plurality of control schemes to be a system of correlations." A7. To support its understanding, the PTAB relied on two dictionary definitions outside of the record before it. *Id.*

> **b.** **The PTAB Rejected ScentAir's Contention that Le Pesant Alone Renders the Claims Obvious Because Le Pesant Does not Disclose Adjusting its Programming for Various Room Volumes or Selecting a Program based on Room Volume**

The PTAB found that Le Pesant does not suggest selecting a control scheme based on room volume[1], so it ruled that Le Pesant fails to render the claims obvious. A12-8. Specifically, the PTAB found that Le Pesant's mention of room volumes between 30-100 cubic meters simply indicates that a "dry fog" droplet size described in Le Pesant is suitable for rooms of those volumes. A17. The PTAB also found that Le Pesant does not disclose adjusting its programming for various room volumes or selecting a program based on room volume. *Id.* And the PTAB held that "[Le Pesant] is silent as to whether adjustments to the

---

[1] ScentAir also admitted that Le Pesant fails to disclose this feature. A1017.

programming of the device are necessary for the device to operate in these various volumes." *Id*. ScentAir did not appeal these findings.

### c.    The PTAB Found that the Combination of Le Pesant and Privas Rendered the Claims Obvious

Regarding its conclusion that the combination of Le Pesant and Privas rendered the claims obvious, the PTAB stated that "[t]he parties' dispute centers on whether Le Pesant teaches control schemes, and whether a person of ordinary skill in the art would have found it obvious to modify Le Pesant to select a control scheme based on the volume of the space to be treated." A13.

To support its conclusion that Le Pesant teaches control schemes as claimed, A18, the PTAB focused on the words "control scheme" separate from the rest of the claim language:

> First, the broadest reasonable interpretation of *control scheme* does not require that the schemes be pre-installed on the device, rather than programmed by a user. The specification does not set forth any such requirement that would justify deviating from the ordinary meaning of control schemes as used in the context of the claims. Regardless of whether the relationship between inputs and device output is programmed into the device of Le Pesant by the manufacturer or the end user, it is a *control scheme* within the meaning of the '068 patent.

A15 (no citations in original) (emphasis in original). Second, the PTAB asserted— again without citation to Le Pesant or the record—"Le Pesant permits the inclusion of multiple pre-established programs on the device, although the user is limited to

selecting one pre-established program (or a user-established program) at a time." *Id.* (no citations in original).

The PTAB acknowledged that Le Pesant does not suggest selecting a control scheme based on volume, A15, but concluded that the "set point value" of Privas is "a control scheme that is selected based on the volume of the space to be treated, the sole limitation of the '068 claims [the PTAB] found [not] disclosed by Le Pesant." A20.

Although it had previously rejected ScentAir's contention that Le Pesant suggests adjusting programming for various room volumes, A16, the PTAB's only rationale for combining Le Pesant and Privas was a statement by ScentAir's declarant grounded in the rejected interpretation of Le Pesant:

> Based on the knowledge about concentration and volume coupled with *Le Pesant's stated desire to treat rooms of varying volumes (rooms between 30 and 100 cubic meters)*, it would have been desirable to one of skill in the art to include Privas' volume based control into the control programs of Le Pesant. One of skill in the art could have readily done so, for example, by having pre-established programs that specify a flow rate and timing "as determined by the volume" of a room as taught by Privas so as to achieve the desired treatment for the corresponding volume. *A user of Le Pesant could then properly treat a room of a given volume by easily selecting the pre-established program for that volume.*

A20 (emphasis added).

Prolitec appealed the PTAB's final written decision to this Court. A1269.

## V.    SUMMARY OF ARGUMENT

This Court should reverse the Final Written Decision because it did not follow the legal requirements for finding claims obvious and because it failed to support its positions with the record. The claims recite a combination of elements relating to an appliance that includes, among other things, a plurality of control schemes specifying operational parameters for the appliance that a user could select based on the volume of the space to be treated. *Supra* at § IV.B. In other words, the patent covers "a device with a user-selectable set of programs (i.e., control schemes), not just a device with programmable settings." A1225, ¶ 59. By providing a liquid diffusion device with multiple control schemes for different volumes, the claimed invention simplifies the device's configuration because the user could simply select the needed control scheme based on the volume of the space to be scented. *Id.*

The PTAB relied on two different references to teach "a plurality of control schemes" and "selecting one of the control schemes based on the volume of the space to be treated." *Supra* at § IV.D.6.c. The primary reference, Le Pesant, discloses a programmable device that uses scent "peaks" for different applications (e.g., an alarm clock). *Supra* at § IV.D.1.a. The secondary reference, Privas, discloses a device that uses "air circulation" as a variable, which could be estimated based on a combination of volume and other variables, that is input to its

18

control program to keep the scent-level constant. *Supra* at § IV.D.1.b. Combining these devices, however, does not result in a device that provides multiple control schemes for a user to select based on the volume of the space to be treated. *Infra* at § VI.B.1-4. Because the Final Written Decision took the claim elements—a plurality of control schemes that may be selected based on volume—out of the context of the claims, it never addressed the differences between the claim limitations and the references. *Id*. For example, the Final Written Decision introduced a construction of "a plurality of control schemes" without addressing that term's relation to the other requirements of the claims. *Infra* at § VI.B.2. Compounding this error, the Final Written Decision based its analysis on conclusory statements with no support cited in the record. *See e.g.*, s*upra* at IV.D.6.c.

The Final Written Decision also failed to identify a sustainable reason to combine these references. The only reason it articulated relied upon expert testimony founded on a reading of Le Pesant that the PTAB itself rejected. *Infra* at § VI.B.3. Thus, the record expressly rejected the foundation of the PTAB's only basis for combining the device. Moreover, references cannot be combined if the combination would render one of the combined devices unsuitable for its intended purpose. *Infra* at § VI.B.3. Here, the PTAB combined devices with irreconcilable purposes. *Id.* The level of scent cannot be both constant (the purpose of Privas's

control program) and peaked (the purpose of Le Pesant's control program) just like land cannot be both flat and mountainous. *Id.* Because the PTAB's obviousness holding lacked support in the record and contradicted foundational legal principles, it must be reversed.

## VI.   ARGUMENT

### A.   Standards of Review

"Claim construction is a legal statement of the scope of the patent right" that the Court reviews *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1276–77, 1284 (Fed. Cir. 2014) (en banc). The PTAB's legal conclusions, including claim construction, are reviewed *de novo*. *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1381 (Fed. Cir. 2012).

Obviousness under 35 U.S.C. § 103(a) is a legal conclusion based on underlying findings of fact. *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir. 2009). The PTAB's ultimate determination of obviousness is reviewed *de novo*. *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). This Court reviews the PTAB's factual findings for substantial evidence. *In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009).

### B.   The PTAB Erred Because the Combination of Le Pesant and Privas Fails to Render the Claims Obvious

The Final Written Decision committed four fatal errors: (1) it misread the references, (2) it failed to consider the claims as a whole, (3) it relied on a

combination that was improper as a matter of law, and (4) it relied upon a reason to combine that was contradicted by its own factual findings.

Establishing unpatentability under § 103 requires certain factual predicates before the legal conclusion can be reached. These are (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the art; and (4) objective indicia of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). With respect to an obviousness analysis, "the agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts." *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002). The Administrative Procedure Act reinforces this obligation. *Id*. at 1344. "[F]ailure to provide such an explanation is grounds for striking down the action." *Mullins v. U.S. Dep't of Energy*, 50 F.3d 990, 992 (Fed. Cir. 1995).

It is a basic axiom of patent law that claims, being definitions, are an entity that must be considered as a whole. *Apple Computer, Inc.*, *v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000); *Gen. Foods Corp. v. Studiengeesellschaft Kohle mb H*, 972 F.2d 1272, 1274 (Fed. Cir. 1992) ("[E]ach claim is an entity which must be considered as a whole."). As a matter of law, that which is "claimed" is the entire invention consisting of all elements. *See Aro Mfg. Co. v. Convertible Top Replacement Co*., 365 U.S. 336, 344 (1961) (recognizing that "if

21

anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim . . . . (noting that "[a] combination is a union of elements, which may be partly old and partly new, or wholly old or wholly new. But, whether new or old, the combination is a means—an invention—distinct from them.").

        1.      **The PTAB's Final Written Decision Should be Reversed Because It Failed to Ascertain the Differences between the Claims and the Cited Art Regarding "A Plurality of Control Schemes"**

           a.      **The PTAB Relied Upon Le Pesant to Teach the Claimed Plurality of Control Schemes, But It Did Not**

Contrary to the PTAB's finding, *supra* at § IV.D.6.c, Le Pesant fails to teach the claimed plurality of control schemes. All of the claims require "a plurality of control schemes" for a liquid diffusion appliance such that one of the control schemes could be selected based on the volume of a space to be treated with the liquid. *See supra* at § IV.B. The parties agree that the term "plurality of control schemes" requires "more than one control scheme." A1255. Rather than disclosing a device that provides a "plurality" of control schemes, Le Pesant discloses a device having electronics that could be programmed to operate the device to dispense odor peaks for one application at a time. A1099-1104; *see also supra* at 8-9. The record below shows that being "programmable" does not mean that the device of Le Pesant provides more than one control scheme to be selected based on

the volume of the space to be treated. A1225, ¶ 59. Even if the device of Le Pesant

could be programmed in multiple ways, and each of those programs is a different

"control scheme," that still does not disclose what the claims require. *Id*. For

example, independent claim 1 recites:

> providing *a plurality of control schemes* for the appliance
> which based on characteristics of the liquid and a level of
> treatment desired for the space, *each of the control
> schemes specifying operational parameters for the
> appliance including a flow rate of liquid, and a periodic
> timing of operation of the diffusion means* [and]
>
> *selecting one of the control schemes*.

A42, 9:25-35, 44 (emphases added)[2]. This combination of claim elements requires

providing *multiple* control schemes that *may be selected*, not simply allowing a

user to *create* his own program, as the PTAB erroneously found. *See supra* at 17.

Similarly, independent claim 24 recites:

> a controller connected to the appliance, *the controller
> including a plurality of control schemes* for dispersion of
> the liquid into the space, each control scheme defining
> operational parameters for the appliance including a
> periodic operation of the diffusion means and the flow
> rate of liquid from the reservoir through the diffusion
> means, each of the control schemes corresponding to a
> particular volume within the space . . .

---

[2] Dependent claims 3-5, 9-13, 15, and 22-23 depend from claim 1 and therefore incorporate the features of claim 1.

A43, 11:13-20 (emphasis added).[3] This requires a controller that *includes multiple control schemes* rather than just a device that is *configurable* with different control schemes at different times, as the PTAB mistakenly concluded. *See supra* at 17.

To reach its mistaken conclusion, the PTAB disregarded expert testimony that "the '068 patent teaches a device with a user-selectable set of programs (i.e., control schemes), not just a device with programmable settings like the control electronics in Le Pesant." A1225, ¶ 59. This distinction was highlighted at oral argument:

> If you buy a new car and you sit in the driver's seat and you want to adjust your car seat, under Le Pesant you would move the lever up or down, forward or back, get the angle of the back rest where you want it, maybe there's an inflatable bladder in the back rest to give you the firmness you want.
>
> Under the '068 patent, you get into the car, and there's a menu of selections. I am six foot one and have a bad back, I need program two, or I'm five nine but with shorter legs than normal, I need program five.

A2031-32.

The PTAB provided two rationales for its faulty conclusion, but both lack support in the record and ignore the claim language. First, the PTAB concluded that the broadest reasonable interpretation of *control scheme* does not require a

---

[3] Dependent claims 26, 28, and 33 depend from claim 24 and therefore incorporate the features of claim 24.

device with pre-installed control schemes, but also includes a device programmed by a user. A15. The Final Written Decision, however, cited nothing in the record to support its conclusion, *id.*, and a decision that does not cite the evidence relied upon must be vacated. *Mullins*, 50 F.3d at 992. Even if the PTAB could have provided record support for its erroneous claim construction, its conclusion failed to address the claims in their entirety. The parties did not dispute the claims' recitation of "providing a plurality of [selectable] control schemes" and a "controller including a plurality of control schemes." Relying on a single program pre-installed on a device or a user programming the device with a single program, as the PTAB did, *supra* at 17, failed to recognize that the claims require "providing *a plurality of* control schemes" and a "controller including *a plurality of* control schemes." The PTAB's interpretation of the prior art at most teaches *a* control scheme or a controller including *a* control scheme. Because the PTAB's analysis failed to address the claim language as a whole, the Final Written Decision failed to establish that the claims are obvious. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530 (Fed. Cir. 1983); *Schenck v. Nortron Corp.,* 713 F.2d 782 (Fed. Cir. 1983).

Second, the PTAB rested its obviousness conclusion on a mischaracterization of the claims:

> Le Pesant permits the inclusion of multiple pre-established programs on the device, although the user is

> limited to selecting one pre-established program (or a
> user-established program) at a time. *The '068 patent*
> *requires nothing else in this regard.*

A15 (emphasis added). The PTAB's faulty conclusion should be reversed because

the Final Written Decision incorrectly concluded that the '068 claims require

"nothing else" other than *permitting* the inclusion of multiple pre-established

programs on the device.[4] A15. On the contrary, the claims recite "*providing* a

plurality of control schemes" (claims 1-23) and a "controller *including* a plurality

of control schemes" (claims 24-33). *See supra* at § IV.B (emphases added). This

requires more than just "permitting" the inclusion of multiple pre-established

programs. It requires that the device actually include a plurality of control

schemes. *Supra* at 5. Again, this distinction was highlighted at oral argument:

> If you buy a new car and you sit in the driver's seat and
> you want to adjust your car seat, under Le Pesant you
> would move the lever up or down, forward or back, get
> the angle of the back rest where you want it, maybe
> there's an inflatable bladder in the back rest to give you
> the firmness you want.
>
> Under the '068 patent, you get into the car, and there's a
> menu of selections. I am six foot one and have a bad
> back, I need program two, or I'm five nine but with
> shorter legs than normal, I need program five.

---

[4] The Board's decision should also be reversed because the Final Written
Decision failed to cite any evidence or anything in the prior art or the record to
support its conclusion that "Le Pesant permits the inclusion of multiple pre-
established programs on the device." A decision that fails to cite the evidence it
relies upon must be reversed. *Mullins*, 50 F.3d at 992.

A2031-32. Because the PTAB's analysis failed to address the claim language as a whole, the Final Written Decision failed to establish that the claims are obvious. *Stratoflex,* 713 F.2d at 1530; *Schenck*, 713 F.2d at 782. Thus, the Court should reverse the Final Written Decision.

> **b.    The Final Written Decision Must Rely Upon Privas for the Claimed Volume Based Selection of a Control Scheme, But It Cannot**

The Final Written Decision relied upon Privas to disclose selecting a control scheme based on volume. *Supra* at § IV.D.6.c. But Privas fails to disclose selecting a control scheme based on volume or even multiple control schemes.

Each of the independent claims requires volume based selection of a control scheme from multiple control schemes. For example, independent claim 1 recites:

> determining a volume of the space to be treated; and

> selecting one of the control schemes based on the volume of the space to be treated

A42, 9:40-42[5]. Similarly, independent claim 24 recites:

> a controller connected to the appliance, the controller including a plurality of control schemes for dispersion of the liquid into the space, each control scheme defining operational parameters for the appliance including a periodic operation of the diffusion means and the flow rate of liquid from the reservoir through the diffusion

---

[5] Dependent claims 3-5, 9-13, 15, and 22-23 depend from claim 1 and therefore incorporate the features of claim 1.

means, *each of the control schemes corresponding to a particular volume within the space*,

A43, 11:13-20 (emphasis added).[6]

The PTAB conceded that Le Pesant fails to disclose the volume based selection of a control scheme. Specifically, the PTAB held:

> Le Pesant's only discussion of volume is in the context of diffused droplet size. The reference discusses the use of a droplet size that results in a "dry fog," and states that "[m]eans of diffusing very small droplets in high numbers like this are well suited to the volume of residential rooms and meeting rooms, typically containing air volumes of between 30 and 100 cubic meters." Contrary to ScentAir's interpretation, however, this statement does not disclose that the device of Le Pesant may be used in 30-100 cubic meter rooms. Rather, Le Pesant is stating diffusion means which result in a "dry fog" *droplet size* are suitable for such volumes.
>
> Le Pesant [does not] disclose that the programming of its device should be adjusted according to the volume of the room; Le Pesant merely suggests that its device is suitable for various volumes. The reference is silent as to whether adjustments to the programming of the device are necessary for the device to operate in these various volumes. Le Pesant, therefore, does not suggest selecting a control scheme based on volume.

A17 (emphasis in original). Because of the deficiencies of Le Pesant, the Final Written Decision must rely upon Privas to teach volume-based selection, but the record did not support this contention. Even where the PTAB receives deference,

---

[6] Dependent claims 26, 28, and 33 depend from claim 24 and therefore incorporate the features of claim 24.

the record still needs to contain support for the PTAB's conclusion to be sustained. *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000) (holding that even when the agency gets deference the Court still reviews the decision for whether a reasonable person might find that the evidentiary record supports the agency's conclusion).

The PTAB's construction requires permitting a user to select a particular correlation based on the volume of the space to be treated. Privas, however, did not disclose selecting a particular correlation (i.e., control scheme) based on the volume of the space to be treated. *See* A1232-33, ¶¶ 74-76. Privas, at best, discloses one of the variables used in a correlation, not selecting different correlations based on volume. *See id*.

Privas uses a microprocessor programmed to send commands to control a fumigating device. A1232, ¶ 74. A frequency of the spray applications may be "computed" by the program based on a set of perimeters. A1166. For example, the microprocessor's programming may incorporate a set point value that corresponds to the mean value representing air circulation inside the indoor area being treated. A1168. The device could measure the set point value using an aeraulic probe. *Id*. Or, in one embodiment, the set point value could be "determined by the volume and the nature" of the treated indoor area using a lookup table issued with the device. *Id*. This does not disclose selecting different correlations; it simply

discloses using an instrument or manually setting one of the inputs for a

correlation. Thus, even if combined, Privas only suggests changing a variable used

by the program of Le Pesant. Indeed, the record fails to point to any section of

Privas that discloses multiple programs on its device and fails to explain why

changing an input would result in selecting different application programs in Le

Pesant, as required by the claims. *Supra* at § IV.D.6.c. Indeed, as discussed above,

the different applications in Le Pesant have nothing to do with volume of the room.

*Supra* at 28-29. Because of the lack of support in the record, the Final Written

Decision must be reversed. *On-Line Careline*, 229 F.3d at 1085.

The PTAB's conclusory assertions did not address these deficiencies. In the

Final Written Decision, the PTAB asserted that:

> Privas discloses selecting a set point based on, or
> corresponding to, the volume of the space to be treated,
> by providing a lookup table that determines the set point
> according to the "volume and the nature of the room
> being treated." Ex. 1012, 14. This set point is, therefore,
> a control scheme that is selected based on the volume of
> the space to be treated, the sole limitation of the '068
> claims we have not found disclosed by Le Pesant.

A20. But it never explained why a set point value, which is a simple input variable,

is a control scheme—or as they construed it, a correlation between particular inputs

and particular outputs for controlling the diffusion means. *Id*. Accordingly, the

PTAB overlooked a significant difference between selecting a control scheme

(e.g., a correlation between particular inputs and particular outputs) and selecting

one input to the control scheme. Because the Final Written Decision failed to address a claim requirement, it failed to consider the claim as a whole. To satisfy the legal requirements of obviousness, however, the PTAB must consider the claims as a whole. *Stratoflex,* 713 F.2d at 1530; *Schenck,* 713 F.2d at 782. Thus, the Court should reverse the Final Written Decision.

> **2.     The Combination of References Fails to Teach the PTAB's Construction of "a Plurality of Control Schemes"**

The Final Written Decision construed "a plurality of control schemes" as "a system of correlations between particular inputs and particular outputs for controlling the diffusion means, which permits a user to select a particular correlation based on user criteria." A9. Nothing in the record explains how the combination of the references could teach the claims under this construction in the context of the claims. Even where the PTAB receives deference, the record must contain support for the PTAB's conclusion to be sustained. *On-Line Careline,* 229 F.3d at 1085.

The combination of Le Pesant and Privas does not disclose the plurality of control schemes under this construction. Indeed, the Final Written Decision never addressed how the cited art teaches its construction in the context of the other elements required by the claims. *See supra* at § IV.D.6. To present a sustainable

31

finding of unpatentability, however, a decision must address the claims as a whole. *Stratoflex,* 713 F.2d at 1530; *Schenck,* 713 F.2d at 782.

Moreover, the Final Written decision ignored evidence in the record showing Le Pesant discloses a device programed for a single application at a time. *Supra* at § VI.1.a. Thus, even assuming the applications of Le Pesant are correlations, Le Pesant would only disclose a device with one correlation at a time, not a device that provides or includes a plurality of correlations between particular inputs and particular outputs for controlling the diffusion means, which permits a user to select a particular correlation based on user criteria. *Id*. And neither Le Pesant nor Privas discloses selecting one of the provided or included correlations based on a volume of the space to be treated. *Supra* at §§ VI.B.1. Accordingly, because the Final Written Decision ignored the claim language and lacked support for its obvious conclusion under its own claim construction, it must be reversed.

### 3. The Irreconcilable Purposes of the References' Programs Render the Programs Uncombinable

The PTAB's combination also suffered from a fundamental problem: the irreconcilable purposes sought by the programs in Le Pesant and in Privas. Obviousness cannot be supported by a combination that renders one of the references unsuitable for its intended purpose. *In re Gordon,* 733 F.2d 900 (Fed. Cir. 1984). Because the references relied upon by the PTAB cannot be combined

without rendering one unsuitable for its intended purpose, the Court should reverse the obviousness determination as improper as a matter of law.

As explained by ScentAir, Le Pesant discloses a program that establishes odor-peak emission cycles, A1016, and Privas discloses treating a room to "maintain a constant level of odor in the indoor space." A1029. Dr. Shedd further explained that

> Le Pesant states that "the purpose of the invention involves renewing cyclically the olfactory perception of the users by taking their neurosensory characteristics into consideration." Col. 2, lines, 15-17. In other words, as evidenced by the discussion throughout the Le Pesant patent, the problem that is addressed by Le Pesant is the "phenomena of olfactory habituation," Col. 2, line 21, also known as scent fatigue or olfactory adaptation.

A1213, ¶ 41.

> One of the purposes of the Privas device—and, indeed the problem that it addresses—is to "produce a fumigation device that is capable of maintaining a constant 'level' of odor in the indoor space being treated with product, even when the indoor space is subjected to air disturbances." *Id.* page 5, ¶ 3. This is a different problem than is solved by the '068 patent. Rather, the '068 patent counsels *against* having a constant level of odor, explaining that a cyclical dispersion of odor is beneficial to counteract the phenomenon of scent fatigue or olfactory adaptation. *See*, *e.g.*, '068 patent, col. 7, lines 35-45.

A1216, ¶ 46.

The PTAB's obviousness conclusion, however, combined the program of Le Pesant that establishes odor peaks with the program of Privas that eliminates odor

peaks to maintain a constant level of odor. *See* A1028-33. These purposes are irreconcilable. Modifying a program designed to provide odor peaks to remove the peaks in order to make the odor level constant renders the program unsuitable for its intended purpose. If a proposed modification would render the modified invention unsatisfactory for its intended purpose, there is no reason to combine as a matter of law. *In re Gordon,* 733 F.2d at 900. Indeed, it is "generally settled that a change in a prior art device which makes the device inoperable for its intended purpose cannot be considered to be an obvious change." *Hughes Aircraft Co. v. United States*, 215 USPQ 787, 804 (Ct. Cl. Trial Div. 1982) , *aff'd in part*, *rev'd in part*, 717 F.2d 1351 (Fed. Cir. 1983). Thus, because the proposed combination of references cannot render the claims obvious as a matter of law, the PTAB's obviousness determination is erroneous and must be reversed.

### 4. The Record and the PTAB's Unappealed Factual Findings Contradict the Only Reason to Combine

To be sustained, an obviousness decision must "articulat[e] reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn,* 441 F.3d 977, 988, 1336 (Fed. Cir. 2006). The Final Written Decision failed to articulate any rational underpinning because its own factual findings undermined its only reason to combine.

The Final Written Decision relied upon Le Pesant teaching "treating rooms of varying volumes, at least ranging between 30 and 100 cubic meters" as the basis

to combine the references. A21. In doing so, the PTAB contradicted itself. As discussed above, the PTAB correctly determined that

> Le Pesant's only discussion of volume is in the context of diffused droplet size. The reference discusses the use of a droplet size that results in a "dry fog," and states that "[m]eans of diffusing very small droplets in high numbers like this are well suited to the volume of residential rooms and meeting rooms, typically containing air volumes of between 30 and 100 cubic meters." Contrary to ScentAir's interpretation, however, this statement does not disclose that the device of Le Pesant may be used in 30-100 cubic meter rooms. Rather, Le Pesant is stating diffusion means which result in a "dry fog" *droplet size* are suitable for such volumes.

> Le Pesant [does not] disclose that the programming of its device should be adjusted according to the volume of the room; Le Pesant merely suggests that its device is suitable for various volumes. The reference is silent as to whether adjustments to the programming of the device are necessary for the device to operate in these various volumes. Le Pesant, therefore, does not suggest selecting a control scheme based on volume.

A17. And nothing in the record pointed to anything in Privas that suggests that adjustments to the programming of Le Pesant's device are necessary for the device to operate in those various volumes. *Supra* at § IV.D.6.c.

The Final Written Decision's combination of Le Pesant and Privas also rested upon the statement that "[o]ne of skill in the art could have readily done so, for example, by having pre-established programs that specify a flow rate and timing 'as determined by the volume' of a room as taught by Privas so as to

achieve the desired treatment for the corresponding volume." *Supra* at § IV.D.6.c.

But Privas does not discuss having different pre-established programs based on

different inputs. *Supra* at § IV.D.1.b. Privas discloses a program that uses "a set

point value" as an input. *Id*.

Accordingly, the PTAB's obviousness determination must be reversed

because the sole basis for combining the cited art relied upon two flawed premises,

not a rational underpinning. *In re Kahn,* 441 F.3d at 988.

## VII.  CONCLUSION

For the foregoing reasons the Court should reverse the PTAB's

unpatentability holding of the '068 patent's claims 1, 3-5, 9-13, 15, 22-24, 26, 28,

and 33.

Date: January 14, 2015                    Respectfully submitted,


                                          /s/Erika H. Arner
                                          Erika H. Arner
                                          J. Derek McCorquindale
                                          FINNEGAN, HENDERSON, FARABOW,
                                           GARRETT & DUNNER, LLP
                                          11955 Freedom Drive
                                          Reston, VA 20190
                                          (571) 203-2700

                                          Cory C. Bell
                                          FINNEGAN, HENDERSON, FARABOW,
                                           GARRETT & DUNNER, LLP
                                          Two Seaport Lane
                                          6th Floor
                                          Boston, MA  02210
                                          (617) 646-1641

                                          *Attorneys for Appellant Prolitec, Inc.*

ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 47
Date:  July 18, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SCENTAIR TECHNOLOGIES, INC.,
Petitioner,

v.

PROLITEC, INC.,
Patent Owner.

————————————

Case IPR2013-00180
Patent 7,930,068

————————————

Before JAMESON LEE, MICHAEL J. FITZPATRICK, and
CHRISTOPHER L. CRUMBLEY, *Administrative Patent Judges*.

CRUMBLEY, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318 and 37 C.F.R. § 42.73*

IPR2013-00180
Patent No. 7,930,068

## I.    BACKGROUND

Petitioner, ScentAir Technologies, Inc. ("ScentAir") filed a Petition (Paper 1, "Pet.") requesting an *inter partes* review of claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 of U.S. Patent No. 7,930,068 (Ex. 1001, "the '068 patent").  Patent Owner, Prolitec, Inc. ("Prolitec"), expressly waived the filing of a patent owner preliminary response.  Paper 11.  In a July 30, 2013, Decision to Institute (Paper 13, "Dec."), we instituted trial on the following grounds:

1.  Claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 as having been obvious over Le Pesant;[1] and
2.  Claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 as having been obvious over the combined disclosures of Le Pesant and Privas.[2]

Dec. 18.

Following institution, Prolitec filed a Patent Owner Response to the Petition (Paper 26, "PO Resp."), and ScentAir filed a Reply (Paper 31, "Pet. Reply").  Oral hearing was requested by both parties, and was held on March 10, 2014.  A transcript of the oral hearing is included in the record.  Paper 44, "Tr."

Both parties presented witness testimony via declaration.  With its Petition, ScentAir provided a Declaration from Charles A. Garris, Jr., Ph.D.  Ex. 1004.  With its Patent Owner Response, Prolitec presented a Declaration from Timothy A.

_____

[1] U.S. Patent No. 6,712,287, issued March 30, 2004 (Ex. 1005).
[2] WO 96/23530, published Aug. 8, 1996 (Ex. 1011).  An English translation of Privas was submitted as Ex. 1012; our citations to "Privas" are to the English language document.

2

IPR2013-00180
Patent No. 7,930,068

Shedd, Ph.D.  Ex. 2001.  Finally, along with its Reply, ScentAir provided a second Declaration from Dr. Garris.  Ex. 1019.

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and arguments raised during trial.  For the reasons discussed below, we determine that ScentAir has met its burden to prove, by a preponderance of the evidence, that claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 of the '068 patent are unpatentable.

A. *The '068 Patent*

The '068 patent is directed to a method and system of controlling operation of a diffusion appliance to treat the atmosphere within an enclosed space.  Ex. 1001, Abstract.  In particular, the '068 patent discloses controlling a diffusion appliance according to a plurality of control schemes, each of which defines the timing of operation of the appliance and the flow rate of the liquid to be diffused into a space.  *Id.* at 3:61-67.  The volume of the space to be treated using the diffusion appliance determines the appropriate control scheme, which can then be selected using, for example, a numerical dial on the appliance.  *Id.* at 3:67-4:5. The '068 patent suggests providing users with a chart of settings which, if the characteristics of the liquids to be diffused are kept consistent, define a set of control schemes appropriate for any given room size.  *Id.* at 4:8-11.  Alternatively, if a liquid of significantly different characteristics is to be diffused in the space, users may be provided with an equivalents table providing revised volumes associated with the settings of the device.  *Id.* at 4:12-16.

3

IPR2013-00180
Patent No. 7,930,068

### B. The Challenged Claims

Of the challenged claims, claims 1 and 24 are independent.  Claims 3-5, 9-13, 15, and 22-23 depend directly or indirectly from claim 1, which is illustrative and set forth below.

> 1.    A method of controlling a liquid diffusion appliance comprising:
>
> providing an enclosed space to be treated by a liquid and with which the appliance is in fluid communication, the appliance including a reservoir of liquid and a means of diffusing the liquid into the air of the space;
>
> *providing a plurality of control schemes for the appliance which based on characteristics of the liquid and a level of treatment desired for the space, each of the control schemes specifying operational parameters for the appliance including a flow rate of liquid, and a periodic timing of operation of the diffusion means*;
>
> providing the diffusion means including a venturi in fluid communication with the liquid reservoir, and the venturi in fluid communication with a source of compressed gas, and wherein operation of the diffusion means comprises release of the pressurized gas into the venturi, the release of the gas into the venturi operating to draw liquid from the reservoir into the venturi where the liquid mixes with the gas at the desired flow rate and then dispersing the gas and liquid mixture into the space;
>
> determining a volume of the space to be treated; and
>
> *selecting one of the control schemes based on the volume of the space to be treated*;
>
> operating the appliance based on the selected control scheme.

Ex. 1001, 9:19-44 (key claim limitations emphasized).

Independent claim 24 is directed to a system for treating an enclosed space with a liquid, and contains limitations similar to those in claim 1, including *control*

4

IPR2013-00180
Patent No. 7,930,068

*schemes*, wherein each of the control schemes corresponds to a particular volume within the space.  Claims 26, 28, and 33 depend from claim 24.

## II.  DISCUSSION

### A. *Claim Construction*

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b).  Under this standard, we construe claim terms using "the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in the applicant's specification."  *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997).  We presume that claim terms have their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted).  However, a patentee may rebut this presumption by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision."  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

For purposes of our Decision to Institute, we gave each claim term its broadest reasonable interpretation, as understood by one of ordinary skill in the art and as consistent with the specification of the '068 patent.  We expressly construed the claim term *venturi* as "a structure having a constriction that causes an increase

5

IPR2013-00180
Patent No. 7,930,068

in the velocity of flow of a fluid and a corresponding decrease in fluid pressure
thereby creating suction."  Dec. 8-10.  We also determined that the terms *means of
diffusing* and *diffusion means* are not means-plus-function limitations within the
scope of 35 U.S.C. § 112, sixth paragraph.  *Id*. at 10-11.  Neither party contested
these constructions during trial, and we discern no reason to modify them.  *See* PO
Resp. 6 (Prolitec does not object to the Board's constructions).

During trial and at oral hearing, the parties' arguments shifted away from the
terms we had construed in our Decision to Institute, and instead focused on
whether the prior art taught the claim limitations *a plurality of control schemes* and
*selecting one of the control schemes based on the volume of the space to be
treated*.  In resolving the parties' dispute, we find it helpful to provide an explicit
construction of the limitation *control schemes*.

### 1. A Plurality Of Control Schemes

In construing *a plurality of control schemes*, our analysis begins with, and
remains centered on, the language of the claims themselves.  *See Interactive Gift
Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1330 (Fed. Cir. 2001).  In the
context of claim 1, a control scheme is "based on characteristics of the liquid"
being diffused into the air, and the "level of treatment desired for the space."  Ex.
1001, 9:26-27.  Each control scheme then specifies operational parameters for the
appliance, including the flow rate of the liquid and the periodic timing of operation
of the diffusion means.  *Id*. at 9:27-30.  The control schemes of claim 24 also
specify the same two operational parameters of flow rate and periodic timing, but
the claim does not require particular inputs to the control scheme.  *Id*. at 11:15-19.

6

IPR2013-00180
Patent No. 7,930,068

In both claims, a user then selects a control scheme based on the particular volume of the space to be treated.  *Id*. at 9:41-42 ; 11:19-20.

Thus, from the language of the claims themselves, we understand *a plurality of control schemes* to be a system of correlations[3] between particular inputs (e.g., characteristics of the liquid and level of treatment) and particular outputs for controlling the diffusion means (e.g., flow rate, periodic timing).  Once this set of correlations is determined, a particular control scheme may be selected based on user criteria including, but not limited to, the volume of the space to be treated.

Upon reviewing the specification of the '068 patent, we do not consider the inventors to have acted as their own lexicographers.  Rather, the usage in the specification is consistent with the plain and ordinary meaning of control schemes as used in the claims.  In particular, Figure 4 of the '068 patent illustrates a chart of settings to control the system, with each row corresponding to a particular control scheme.  *Id*. at 3:61-65.  A partial excerpt of Figure 4 is reproduced below.

---

[3] *See scheme*, RANDOM HOUSE KERNERMAN WEBSTER'S COLLEGE DICTIONARY (2010) (available at http://www.thefreedictionary.com/scheme) ("any system of correlated things, parts, etc., or the manner of their arrangement"); *see also scheme*, COLLINS ENGLISH DICTIONARY (2003) (available at http://www.thefreedictionary.com/scheme) ("a systematic arrangement of correlated parts; system").

7

IPR2013-00180
Patent No. 7,930,068

FIG. 4

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 54 | 111 | | 112 | 114 | | 116 | | 118 | | | 120 |
| Room Vol. (cft) | Dial (DS) | NSU Output (ml/hr) | Speed (%PWM) | Ton (Sec) | Ton (mn) | Toff (Sec) | Toff (mn) | Duty cycle (% on) | Avg Consump. (ml/hr) | Monthly usage (ml) | Cartridge life (weeks) |
| 80 | 1 | | | | | | | | | | 150 |
| 160 | 2 | | | | | | | | | | 102 |
| 240 | 3 | | | | | | | | | | 80 |
| 320 | 4 | | | | | | | | | | 66 |
| 400 | 5 | | | | | | | | | | 56 |
| 480 | 6 | | | | | | | | | | 49 |
| 560 | 7 | | | | | | | | | | 35 |
| 640 | 8 | | | | | | | | | | 31 |
| 720 | 9 | | | | | | | | | | 28 |
| 880 | 10 | | | | | | | | | | 26 |
| 1040 | 11 | | | | | | | | | | 24 |
| 1200 | 12 | | | | | | | | | | 22 |
| 1360 | 13 | | | | | | | | | | 20 |
| 1710 | 14 | | | | | | | | | | 16 |
| 1890 | 15 | | | | | | | | | | 15 |
| 2070 | 16 | | | | | | | | | | 14 |
| 2250 | 17 | | | | | | | | | | 13 |

110

    In the above partial excerpt of Figure 4, each control scheme 110 specifies
speed setting 112 and duty cycle 118. *Id*. at 4:22-25. The specification states that
each control scheme "*may, for example*, be associated with a particular numerical
dial setting or other selectable setting 111," and that each setting 111 "*may* be
defined as suitable for a particular volume 54." *Id*. at 3:67-4:4 (emphases added).
In the event that the characteristics of the liquid to be diffused differ from those of
a standard liquid, the specification states that additional tables may be supplied that
set forth alternative control schemes. *Id*. at 4:12-17.

    Prolitec asks that we construe *control schemes* as "a set of operational
parameters for the appliance." PO Resp. 6. ScentAir does not proffer a particular
construction, but Prolitec notes that, in related district court litigation, ScentAir
defined the term as "systematic plan of control." *Id*. (citing Ex. 1015, 3). We
decline to adopt either construction as the broadest reasonable interpretation of the
claim language. Prolitec's construction, "a set of operational parameters for the

8

IPR2013-00180
Patent No. 7,930,068

appliance," merely repeats language used in the claim immediately following *control schemes*, and therefore, adds nothing to the understanding of the term. *See, e.g.*, Ex. 1001, 9:27-29 ("each of the control schemes specifying operational parameters for the appliance"). In addition, by focusing on the "operational parameters" aspect of the control scheme, Prolitec's construction ignores that the control schemes are relationships between inputs and those operational parameters, which may be selected by the user according to some other criteria. This feature was repeatedly emphasized by Prolitec's counsel at oral argument. Tr. 34 ("adjusting all of these other variables automatically according to that easy to estimate variable . . . in our view that's the whole point of the '068 control schemes."). ScentAir's district court claim construction, by focusing on a "systematic plan of *control*," similarly errs by focusing only on the output of the control scheme, and not also on the input.

Based on the foregoing, we consider the broadest reasonable interpretation of *a plurality of control schemes* to be a system of correlations between particular inputs and particular outputs for controlling the diffusion means, which permits a user to select a particular correlation based on user criteria.

## B. *Prior Art References*

Neither party disputes that the following two references at issue in the instituted trial are prior art to the '068 patent.

### 1. *Le Pesant*

Le Pesant discloses a programmable, odor-bearing substance diffusion device. Ex. 1005, Abstract. Figure 2 of Le Pesant, reproduced below, illustrates

9

IPR2013-00180
Patent No. 7,930,068

"a means of drop diffusion" (*Id.* at 5:41-42):



## FIG.2

Figure 2 of Le Pesant illustrates drop diffusion means 22 according to one embodiment of the invention. The drop diffusion means includes first tube 24 connected to a tank containing liquid to be diffused 6, and second tube 26 connected to air pump outlet 10a. *Id.* at 7:6-9. Both tubes have tapered sections 24b, 26b that converge toward smaller section outlets 24c, 26c. *Id.* at 7:10-19. The tubes are arranged at right angles so that a jet of air from mouth 26c of the second tube passes over mouth 24c of the first tube. *Id.* at 7:23-24. Le Pesant

10

IPR2013-00180
Patent No. 7,930,068

notes that the "jet of air, by a Venturi effect, draws the liquid into the first tube and projects it in fine droplets G." *Id*. at 7:25-27.

Le Pesant discloses that the system includes control electronics 12 that control the air pump 10, thereby permitting control of the flow of droplets G from the diffusion means. *Id*. at 7:40-46. The control electronics also can determine intervals between successive emissions of the device. *Id*. at 13:1-6. According to Le Pesant, the emission cycles are "calculated to take into consideration the saturation and de-saturation time of the olfactory nervous system." *Id*. at 3:38-41.

The control electronics of Le Pesant comprise a central processing unit that includes a microprocessor that may be programmed by the user to perform various sequences of operation of the diffusion device. *Id*. at 11:24-31. Alternatively, Le Pesant discloses that the device may be operated according to a pre-established program instead of a user-set program. *Id*. at 7:42-46. The examples of Le Pesant disclose modes of operation of the device appropriate for various applications, such as waking a user from sleep (Example 1) or from a coma (Example 2), or assisting in smoking cessation (Example 3). *Id*. at 13:35-15:17. Example 5 of Le Pesant discloses programming the device to emit a combination of odors using various emission times and internals, in order to prevent scent fatigue. *Id*. at 15:25-55.

11

IPR2013-00180
Patent No. 7,930,068

2. *Privas*

Privas discloses a fumigation device for fluid products, such as deodorizers or air fresheners. Ex. 1012, 1.[4] The fumigation device comprises a microprocessor, which determines the activation frequency for the product pump such that "the quantity of gaseous product distributed by the air conditioning system into the treated area is directly determined in relation to a real, representative parameter." *Id*. at 12. In one embodiment, this determination is performed by incorporating a set point value that represents the air circulation in the area being treated. *Id*. at 14. In a second embodiment, a "lookup table" may accompany the device, which determines the set point value according to "the volume and the nature of the room being treated." *Id*.

C. *Obviousness Over Le Pesant*

There is no material dispute between the parties regarding whether most of the limitations of claims 1 and 24 are disclosed by Le Pesant. For example, Prolitec does not contend that Le Pesant fails to disclose a reservoir of liquid and a means of diffusing that liquid into a space, or that the diffusion means does not include a venturi. Nor does Prolitec dispute whether any of the limitations of the dependent claims is disclosed by Le Pesant. Given the evidence before us that Le Pesant discloses these elements, we find that ScentAir has shown by a preponderance of the evidence that these elements are present in Le Pesant.

---

[4] Exhibit 1012 contains page numbers at both the top and bottom of several pages. Our citations herein are to the upper page numbers.

12

IPR2013-00180
Patent No. 7,930,068

The parties' dispute centers on whether Le Pesant teaches *control schemes*, and whether a person of ordinary skill in the art would have found it obvious to modify Le Pesant to select a control scheme based on the volume of the space to be treated. We address these issues in turn below.

### 1. Le Pesant Teaches Control Schemes

According to ScentAir, Le Pesant discloses a device that includes a microprocessor programmed to perform various sequences for operating the diffusion means. Pet. Reply 4. In particular, Le Pesant states that the device may be operated "according to established programming chosen by the user . . . or to a pre-established program." Ex. 1005 7:44-46. In ScentAir's view, it is these "various sequences"—which control the flow rate and timing of the diffusion means—that correspond to the claimed plurality of control schemes. Pet. Reply 4.

ScentAir also directs our attention to the examples of Le Pesant, contending that the various applications described therein constitute a plurality of control schemes. Tr. 15-16. For instance, Example 1 discloses an embodiment of the device that is programmed to wake the user from sleep, whereas Example 5 discloses a set of programming for preventing scent fatigue. Ex. 1005 13:40-15:54. ScentAir notes that Prolitec's witness, Dr. Shedd, conceded that Example 5 of Le Pesant "relates to one complicated control scheme." Pet. Reply 5 (citing Ex. 2001 ¶ 56).

Prolitec, by contrast, describes the control electronics and programming of Le Pesant as "simple programmable electronics" that are "akin to a programmable alarm clock." PO Resp. 15. "Just because a device has programmable inputs,"

13

IPR2013-00180
Patent No. 7,930,068

reasons Prolitec, "does not mean that it provides more than one control scheme for a user to choose from." *Id*. at 16. This distinction between the control schemes of the '068 patent and the programmable device of Le Pesant was further clarified by Prolitec's counsel at oral argument:

> MR. BAISH: [] The '068 device comes with a plurality of control plans within the device as opposed to a device that can just function on a range that is programmed by the user, and I think that distinction is critical to the difference between the '068 and the prior art.

Tr. 33-34. In other words, according to Prolitec, the control schemes of the '068 patents come pre-installed on the device, whereas the programming of the Le Pesant device is performed by the user. Prolitec further contends that the device of Le Pesant comes with, at most, a "singular, pre-established program." *Id*. at 35 (citing Ex. 1005, 7:40-46).

Based on our evaluation of the parties' arguments and our review of the record, we find that Le Pesant discloses control schemes, as that claim term is properly construed. The device of Le Pesant adjusts its control programming according to the liquid to be diffused and the level of treatment desired, as required by claim 1. Ex. 1005, 3:44-49, 15:43-47. The device also specifies the flow rate, emission times, and intervals, as required by claims 1 and 24. *Id*. at 7:42-46, 13:1-6. A user may choose the programming that controls the device. *Id*. at 7:40-46. The programming of Le Pesant is, therefore, a plurality of *control schemes* as we have construed the term: a system of correlations between particular inputs and particular outputs for controlling the diffusion means, which permits a user to select a particular relationship based on user criteria.

14

IPR2013-00180
Patent No. 7,930,068

We do not find Prolitec's arguments to the contrary persuasive, for at least
two reasons.  First, the broadest reasonable interpretation of *control scheme* does
not require that the schemes be pre-installed on the device, rather than programmed
by a user.  The specification does not set forth any such requirement that would
justify deviating from the ordinary meaning of control schemes as used in the
context of the claims.  Regardless of whether the relationship between inputs and
device output is programmed into the device of Le Pesant by the manufacturer or
the end user, it is a *control scheme* within the meaning of the '068 patent.

Second, assuming *arguendo* that the *control schemes* must be programmed
before the device reaches the end user, Le Pesant would not exclude such an
embodiment.  Prolitec's reliance on a "singular, pre-established program" (Tr. 35)
in Le Pesant demonstrates a misinterpretation of the reference.  Le Pesant discloses
that the device is controlled "according to established programming chosen by the
user . . . or to a pre-established program," not a "singular" program as argued by
Prolitec.  Le Pesant permits the inclusion of multiple pre-established programs on
the device, although the user is limited to selecting one pre-established program (or
a user-established program) at a time.  The '068 patent requires nothing else in this
regard.

### 2. Le Pesant Does Not Suggest Selection of a Control Scheme Based On Volume

ScentAir concedes that Le Pesant does not teach "selecting one of the
control schemes based on the volume of the space to be treated" (Claim 1) or
"control schemes corresponding to a particular volume within the space" (Claim
24).  Pet. 14.  However, ScentAir contends that Le Pesant states that its diffusion

15

IPR2013-00180
Patent No. 7,930,068

device can be used to treat rooms of various sizes, "typically containing air volumes of between 30 and 100 cubic meters." *Id*. (citing Ex. 1005, 10:6-10).

ScentAir further relies on the declaration of Dr. Garris for the proposition that "it would have been desirable to one of skill in the art to tailor one or more of the pre-established programs in Le Pesant to a given volume." *Id.* (citing Ex. 1004 ¶¶ 21-22). In his declaration, Dr. Garris states that "[i]t is common sense and well-known in the field of fluid machinery, mass transfer and associated control that the concentration of the diffused liquid within a space is affected by the volume of the space." Ex. 1004 ¶ 22. "One of skill in the art could have readily . . . specif[ied] a flow rate and timing for a given pre-established program that achieves the desired treatment for the corresponding volume." *Id*.

Dr. Shedd, Prolitec's witness, agreed that "volume is a fundamental parameter in determining concentration," a statement relied on heavily by ScentAir. Pet. Reply 7; Ex. 1019 ¶ 22 (citing Ex. 2001 ¶ 32). When read in the context of Dr. Shedd's entire statement, however, he concluded that "volume is only one parameter that is relevant to estimating the amount of scent or liquid to be effective in a given area." Ex. 2001 ¶ 32.

Upon review of Le Pesant and the declaration testimony of Dr. Garris and Dr. Shedd, ScentAir has not carried its burden of proving that Le Pesant would have suggested to one with ordinary skill in the art selecting a control scheme based on the volume of the space to be treated. Le Pesant's only discussion of volume is in the context of diffused droplet size. The reference discusses the use of a droplet size that results in a "dry fog," and states that "[m]eans of diffusing very small droplets in high numbers like this are well suited to the volume of

16

IPR2013-00180
Patent No. 7,930,068

residential rooms and meeting rooms, typically containing air volumes of between 30 and 100 cubic meters." Ex. 1005, 10:5-10.  Contrary to ScentAir's interpretation, however, this statement does not disclose that the device of Le Pesant may be used in 30-100 cubic meter rooms.  Rather, Le Pesant is stating diffusion means which result in a "dry fog" *droplet size* are suitable for such volumes.

Nor does Le Pesant disclose that the programming of its device should be adjusted according to the volume of the room; Le Pesant merely suggests that its device is suitable for various volumes.  The reference is silent as to whether adjustments to the programming of the device are necessary for the device to operate in these various volumes.[5]  Le Pesant, therefore, does not suggest selecting a control scheme based on volume.

Nor does Dr. Garris' testimony that it is "common sense" that concentration of diffused liquid is affected by volume (Ex. 1004 ¶ 22) provide the necessary reason to modify Le Pesant.  A known relationship between concentration and volume does not provide a reason to modify the device to take advantage of that relationship, especially when at least one interpretation of Le Pesant suggests that no modification is necessary.  ScentAir has not articulated a persuasive reason

---

[5] *See* Tr. 20-21 ("JUDGE CRUMBLEY: I can read [Le Pesant] the way you take it, which is you would need to adjust it in some way to make it operate differently depending on the size of the room, but you could also read it as this device without any interference from the user is suitable for treating a room with a range from 30 to 100 cubic meters. One of those presents you with a need for volume based control. The other one doesn't.  MR. POND: Yes, Your Honor.")

17

IPR2013-00180
Patent No. 7,930,068

that—based on the disclosure of Le Pesant alone—a skilled artisan would have sought to modify the device of Le Pesant to include volume-based control.  For this reason, ScentAir has not shown by a preponderance of the evidence that Le Pesant renders obvious the subject matter of claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33, as it fails to teach or suggest the selection of a control scheme based on the volume of the space to be treated.

### D. Obviousness Over Le Pesant in Combination with Privas

Again, the parties' dispute regarding the combination of Le Pesant and Privas focuses on a few particular issues.  There is no material dispute that the combined disclosures teach most of the limitations of the independent claims, such as diffusion means including a venturi.  Nor does Prolitec contend that any of the limitations of the dependent claims is not disclosed by the combined references.  As before, we find that ScentAir has met its burden of demonstrating by a preponderance of the evidence that these claim elements are disclosed by the combination of Le Pesant and Privas.

Turning to the disputed elements, Prolitec argues that the combined disclosures do not teach *control schemes* or selecting a control scheme based on the volume of the space to be treated.   Prolitec also argues that it would not have been obvious to combine Le Pesant and Privas, because Privas is nonanalogous art and teaches away from the claimed invention.  Regarding Prolitec's first argument, we found above that Le Pesant discloses *control schemes*.  We address Prolitec's further arguments below.

18

IPR2013-00180
Patent No. 7,930,068

### 1. *Privas Teaches Selection of a Control Scheme Based on Volume*

As noted above, Privas discloses controlling a fumigation system using a microprocessor that incorporates a "set point value" representing the air circulation in the area being treated. Ex. 1012, 14. Prolitec contends that this does not constitute selecting a control scheme based on the volume of the space to be treated, as required by the challenged claims. PO Resp. 26-27. Prolitec's argument emphasizes that Privas' "set point" represents air circulation, not volume, and may be determined empirically.[6] *Id.* at 28-29. Prolitec urges, therefore, that Privas' "set point value" is not the "equivalent of volume." *Id.*

The claims before us, however, do not require selection of a control scheme based exclusively on volume or an "equivalent" of volume. Rather, claim 1 and its dependent claims require "selecting one of the control schemes based on the volume of the space to be treated," whereas claim 24 and its dependent claims require "each of the control schemes corresponding to a particular volume within the space." Indeed, the specification of the '068 patent explicitly contemplates other factors, such as the nature of the liquid being dispersed, as having an impact on the control scheme selected. Ex. 1001, 4:12-17; *see also* Tr. 44 ("MR. BAISH: [] [T]he specification talks about there might be multiple settings appropriate to a

---

[6] As ScentAir notes, Privas discloses two embodiments of its device: an "industrial" one, which uses an aeraulic probe to empirically determine air circulation, and a simpler "household" embodiment, which uses a lookup table to determine the set point. Ex. 1012, 14.

19

IPR2013-00180
Patent No. 7,930,068

given volume. . . . [B]ut the settings are all premised on the adjustment of volume. It's not to say other factors don't come into place, personal taste of course.").

Privas discloses selecting a set point based on, or corresponding to, the volume of the space to be treated, by providing a lookup table that determines the set point according to the "volume and the nature of the room being treated." Ex. 1012, 14. This set point is, therefore, a control scheme that is selected based on the volume of the space to be treated, the sole limitation of the '068 claims we have not found disclosed by Le Pesant. Thus, we find that Le Pesant and Privas together disclose all elements of independent claims 1 and 24, as well as those of dependent claims 3-5, 9-13, 15, 22-23, 26, 28, and 33, for which Prolitec has not presented additional arguments.

### 2. Reason To Combine Le Pesant and Privas

ScentAir relies on the testimony of Dr. Garris to support the combination of Le Pesant with Privas. In addition to noting that both Le Pesant and Privas disclose liquid diffusion devices, Dr. Garris states that:

> Based on the knowledge about concentration and volume coupled with Le Pesant's stated desire to treat rooms of varying volumes (rooms between 30 and 100 cubic meters), it would have been desirable to one of skill in the art to include Privas' volume based control into the control programs of Le Pesant. One of skill in the art could have readily done so, for example, by having pre-established programs that specify a flow rate and timing "as determined by the volume" of a room as taught by Privas so as to achieve the desired treatment for the corresponding volume. A user of Le Pesant could then properly treat a room of a given volume by easily selecting the pre-established program for that volume.

Ex. 1004 ¶ 42.

20

IPR2013-00180
Patent No. 7,930,068

Prolitec argues that this rationale fails to provide a reason to combine the references, contending that Le Pesant does not express a "desire" to treat various volumes and that Privas does not disclose volume-based control. PO Resp. 36. We disagree with the latter argument, as we have already found that Privas discloses selecting a "set point" based—at least in part—on the volume of the space to be treated. With respect to the former argument, we find that Le Pesant discloses treating rooms of varying volumes, at least ranging between 30 and 100 cubic meters. Ex. 1005, 10:8-10. As discussed above, this does not provide a reason to modify Le Pesant to include volume-based control, but we conclude that it provides sufficient reason to combine Le Pesant with Privas, which discusses volume-based control. A person of ordinary skill in the art seeking to use the liquid diffusion device of Le Pesant in rooms of varying volumes would have reason to incorporate the volume based-control of Privas' liquid diffusion device.

Prolitec makes two additional arguments regarding the combination of Le Pesant and Privas, neither of which we find persuasive. First, Prolitec contends that Privas is non-analogous art and should not be considered. PO Resp. 30-32. Second, Prolitec argues that Privas teaches away from the '068 patent. *Id*. at 32-34. We address each argument in turn.

*a. Privas is Analogous Art*

A prior art reference is considered to be analogous if it is either: 1) from the same field of endeavor, regardless of the problem addressed; or 2) reasonably pertinent to the particular problem with which the inventor is concerned, regardless of the field of endeavor. *See In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992). "A

21

IPR2013-00180
Patent No. 7,930,068

reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *Id.* at 659.  The determination of whether a prior art reference is analogous is a factual one.  *Id.* at 658.

We find that Privas is analogous art, as it is from the "same field of endeavor" as the '068 patent.  Prolitec argues that Privas is directed to fumigation devices, whereas the '068 patent is directed to atomizers.  PO Resp. 30-31. Prolitec cites the testimony of Dr. Shedd, who notes that the two devices operate under different principles of diffusion.  *Id*.  ("In an atomizer like the '068 patent device, fluid is diffused in a liquid state but in Privas it is diffused in a gaseous state.") (citing Ex. 2001, ¶¶ 44, 82).

ScentAir asserts that Privas is from the same field of endeavor as the '068 patent, noting that the Privas fumigation device contains both an atomizer *and* an evaporator.  Pet. Reply 10.  ScentAir cites Dr. Garris' testimony that the Privas device is "structurally and functionally akin to the subject matter of the '068 patent—but with an additional diffusion means."  *Id*. (citing Ex. 1019 ¶ 35).

We do not consider the additional evaporator of Privas as somehow removing Privas from the same field of endeavor as the '068 patent.  Both devices are used treat the air within a space using diffusion means that comprise an atomizer.  Prolitec has not pointed us to any functional difference that would distinguish the devices in a meaningful way.  Tr. 48 ("JUDGE CRUMBLEY:  At least some portion of [Privas'] operation is the same as ScentAir's.  MR. BAISH: That's true, yes.").  Indeed, the devices of Privas and the '068 patent have

22

IPR2013-00180
Patent No. 7,930,068

significant structural similarities, including the reservoir of liquid and the atomizer/venturi. These structural and functional similarities would have led one of ordinary skill in the art working in the field of atomizing devices, such as those of the '068 patent, to consider similar devices, such as the fumigator of Privas. *See In re Bigio*, 381 F.3d 1320, 1325-26 (Fed. Cir. 2004).

Having found that Privas and the '068 patent pertain to the same field of endeavor, we need not reach the "reasonably pertinent to the particular problem" test. We simply note that both Privas and the '068 patent address the problem of maintaining a constant level of odor within the space being treated. *Compare* Ex. 1001, 1:36-38, 10:22-26 (level of treatment within the space is substantially constant) *with* Ex. 1012, 2 (device capable of maintaining a constant level of odor in the space).

b. *Privas Does Not Teach Away*

Prolitec also argues that the skilled artisan would not have combined Le Pesant with Privas, because "Privas actually teaches away from the invention in the '068 patent." PO Resp. 32-34. Privas teaches that atomizers are useful for small spaces, but "when treating vaster areas, this technique is unsuitable, resulting in poor dispersion of the product throughout the room." Ex. 1012, 4. Prolitec argues that the '068 patent, by contrast, "is suitable for treating spaces larger than those disclosed or taught by Le Pesant." PO Resp. 33.

A reference teaches away from a combination when, for example, a person of ordinary skill in the art would be discouraged from following the path set out in the reference, or would be led in a direction divergent from that chosen by the

23

IPR2013-00180
Patent No. 7,930,068

inventor.  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).  "[I]n general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant."  *Id*.

At the outset, we note that Prolitec frames its analysis as "Privas [] teaches away from *the invention in the '068 patent*" (PO Resp. 32) (emphasis added), whereas the proper inquiry is whether the reference teaches away from the *combination* with Le Pesant.  Prolitec's arguments comparing the spaces contemplated by Privas with the spaces treated in the '068 patent are, therefore, beside the point.

In any event, we are not persuaded that Privas teaches away from the combination with Le Pesant.  Privas states that atomizers are suitable for "localized treatments," but does not quantify what volume would be considered "a small area of space."  Ex. 1012, 1.  Prolitec has presented no evidence that Privas' "small area of space" would not overlap with Le Pesant's spaces of 30-100 cubic meters.  There is insufficient evidence before us to conclude that Privas teaches away from a combination with Le Pesant.

### III.   CONCLUSION

We have considered the scope and content of the prior art; the differences between the prior art and the challenged claims; the level of ordinary skill in the art; and the objective indicia of nonobviousness.  *See Graham v. John Deere Co.*, 383 U.S. 1, 18-19 (1966).  We conclude that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 of

24

IPR2013-00180
Patent No. 7,930,068

the '068 patent are unpatentable under 35 U.S.C. § 103, as they would have been obvious over the combined disclosures of Le Pesant and Privas.

## IV.  ORDER

In consideration of the foregoing, it is

ORDERED that claims 1, 3-5, 9-13, 15, 22-24, 26, 28, and 33 of U.S. Patent No. 7,930,068 are *unpatentable*; and

FURTHER ORDERED that, because this is a final decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

25

IPR2013-00180
Patent No. 7,930,068


For PETITIONER:

Walter Renner
Kevin Greene
Fish & Richardson, P.C.
axf@fr.com
apsi@fr.com


For PATENT OWNER:

Jennifer L. Gregor
James D. Peterson
Nicholas A. Kees
GODFREY & KAHN, S.C.
jgregor@gklaw.com
jpeterson@gklaw.com
nkees@gklaw.com

26



US007930068B2

(12) **United States Patent**
Robert et al.

(10) **Patent No.:** **US 7,930,068 B2**
(45) **Date of Patent:** **Apr. 19, 2011**

(54) **SYSTEM AND METHOD OF CONTROLLING OPERATION OF A LIQUID DIFFUSION APPLIANCE**

(75) Inventors: **Marc Robert**, Mukwonago, WI (US); **Richard Weening**, West Palm Beach, FL (US)

(73) Assignee: **Prolitec, Inc.**, Milwaukee, WI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 598 days.

(21) Appl. No.: 11/691,363

(22) Filed: **Mar. 26, 2007**

(65) **Prior Publication Data**

US 2008/0243273 A1    Oct. 2, 2008

(51) **Int. Cl.**
*G05D 7/00* (2006.01)
*A61L 9/00* (2006.01)

(52) **U.S. Cl.** ............................... **700/283**; 422/5; 222/52

(58) **Field of Classification Search** .................... 700/67, 700/281, 282, 283, 285; 239/34, 44, 45, 239/68, 69, 573; 222/1, 14, 52, 57, 71, 649; 261/26, 115; 422/5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,924,597 A * | 7/1999 | Lynn | ................................ | 222/1 |
| 6,267,297 B1 * | 7/2001 | Contadini et al. | .............. | 239/69 |
| 6,739,479 B2 * | 5/2004 | Contadini et al. | .............. | 222/52 |
| 2003/0175148 A1 * | 9/2003 | Kvietok et al. | .................... | 422/5 |
| 2006/0060990 A1 * | 3/2006 | Szpekman | ...................... | 239/69 |
| 2006/0078461 A1 * | 4/2006 | Kaplan | ............................ | 239/333 |
| 2007/0166185 A1 * | 7/2007 | Bartels | ............................ | 422/5 |

* cited by examiner

*Primary Examiner* — Charles R Kasenge

(74) *Attorney, Agent, or Firm* — Alan R. Stewart; Godfrey & Kahn, S.C.

(57) **ABSTRACT**

A method and system of controlling operation of a diffusion appliance to treat the atmosphere within an enclosed space. The appliance may be programmed to operate according to a control scheme specifying a flow rate of liquid to a diffusion means and a periodic operation of the diffusion means. Control schemes may be associated with different volumes of spaces to be treated by the appliance. Anti-fatigue schemes may provide variation of the flow rate or periodic operation of the appliance. Initiation controls schemes may be used to start treatment of the space before the appliance is programmed to operate according to one of the control schemes.

**33 Claims, 10 Drawing Sheets**



-- 1 --

ScentAir 1001





FIG. 2

100

FIG. 2a

106

102

100

108

104

FIG. 3

150



FIG. 3a



FIG. 4

| Room Vol. (cft) | Dial (DS) | NSU Output (ml/hr) | Speed (%PWM) | Ton (Sec) | Ton (mn) | Toff (Sec) | Toff (mn) | Duty cycle (% on) | Avg Consump. (ml/hr) | Monthly usage (ml) | Cartridge life (weeks) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 54 | 111 | | 112 | 114 | | 116 | | 118 | | 120 | |
| 80 | 1 | | | | | | | | | | 150 | |
| 160 | 2 | | | | | | | | | | 102 | 110 |
| 240 | 3 | | | | | | | | | | 80 | |
| 320 | 4 | | | | | | | | | | 66 | |
| 400 | 5 | | | | | | | | | | 56 | |
| 480 | 6 | | | | | | | | | | 49 | |
| 560 | 7 | | | | | | | | | | 35 | |
| 640 | 8 | | | | | | | | | | 31 | |
| 720 | 9 | | | | | | | | | | 28 | |
| 880 | 10 | | | | | | | | | | 26 | |
| 1040 | 11 | | | | | | | | | | 24 | |
| 1200 | 12 | | | | | | | | | | 22 | |
| 1360 | 13 | | | | | | | | | | 20 | |
| 1710 | 14 | | | | | | | | | | 16 | |
| 1890 | 15 | | | | | | | | | | 15 | |
| 2070 | 16 | | | | | | | | | | 14 | |
| 2250 | 17 | | | | | | | | | | 13 | |
| 2430 | 18 | | | | | | | | | | 13 | |
| 2610 | 19 | | | | | | | | | | 12 | |
| 2880 | 20 | | | | | | | | | | 11 | |
| 3060 | 21 | | | | | | | | | | 9.5 | |
| 3240 | 22 | | | | | | | | | | 9.1 | |
| 3420 | 23 | | | | | | | | | | 8.7 | |
| 3600 | 24 | | | | | | | | | | 8.4 | |
| 3780 | 25 | | | | | | | | | | 8.0 | |
| 3960 | 26 | | | | | | | | | | 7.7 | 110 |
| 4140 | 27 | | | | | | | | | | 7.5 | |
| 4320 | 28 | | | | | | | | | | 6.4 | |
| 4500 | 29 | | | | | | | | | | 6.2 | |
| 4680 | 30 | | | | | | | | | | 6.0 | |
| 4950 | 31 | | | | | | | | | | 5.8 | |
| 5130 | 32 | | | | | | | | | | 5.6 | |
| 5310 | 33 | | | | | | | | | | 5.5 | |
| 5490 | 34 | | | | | | | | | | 5.3 | |
| 5670 | 35 | | | | | | | | | | 4.6 | |
| 5850 | 36 | | | | | | | | | | 4.5 | |
| 6030 | 37 | | | | | | | | | | 4.4 | |
| 6900 | 38 | | | | | | | | | | 4.2 | |
| 7100 | 39 | | | | | | | | | | 4.1 | |
| 7300 | 40 | | | | | | | | | | 4.0 | |
| 7500 | 41 | | | | | | | | | | 4.0 | 110 |
| | 42 | | | | | | | | 100.0% | | 2.2 | |
| | 43 | | | | | | | | 100.0% | | 1.8 | |
| | 44 | | | | | | | | 100.0% | | 1.6 | |
| | 45 | | | | | | | | 100.0% | | 1.3 | |
| | 46 | | | | | | | | 100.0% | | 1.1 | |
| | 47 | | | | | | | | 100.0% | | 1.0 | |



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9

56

52

52

50

FIG. 10

74

72

52

50



FIG. 11

108

56

52

52

108

108

52

50

50

50

US 7,930,068 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEM AND METHOD OF CONTROLLING OPERATION OF A LIQUID DIFFUSION APPLIANCE

## TECHNICAL FIELD

The present disclosure relates generally to systems and methods of controlling operation of a liquid diffusion device.

## BACKGROUND

In existing scent and liquid diffusion devices, a variety of approaches to controlling the operation or output of the devices are currently used. However, these conventional approaches tend to be sub-optimal with regard to initiating treatment of a space with a liquid or scent compound, and do not take into account fatigue or resistance by users or occupiers of the space. Existing approaches also do not take into account operational characteristics of the diffusion devices in determining when, for how long and at what speed to operate the apparatus.

Conventional controls for dispersal of liquid within a space may include sensors at locations spaced-apart from the diffusion device. However, providing connectivity between the sensor and the diffusion device may add undesirable complexity to an installation and may not be appropriate in situations where permanent or persistent mounting of the diffusion device is not desired or possible.

With liquid diffusion devices that are configured to disperse very small particles of liquid, for example, in the micron or sub-micron size range, it may be desirable to allow previously dispersed particles to decay or be removed from the air within a treated space before adding more particles to the space. If the rate is diffusion within the space is greater than the rate of decay, the concentration of the liquid within the treated space will trend upwards instead of remaining within a desired range of concentration.

Improvements to the conventional approaches to control and operation of liquid diffusion devices are desirable.

## SUMMARY

The present invention relates generally to systems and methods of controlling operation of a liquid diffusion device. In particular, the present invention relates to approaches to controlling speed and duration of the operation of a diffusion appliance and when the diffusion appliance should be operated.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawing figures, which are incorporated in and constitute a part of the description, illustrate several aspects of the invention and together with the description, serve to explain the principles of the invention. A brief description of the figures is as follows:

FIG. **1** is a diagrammatic view of a space to be treated by a diffused liquid and a liquid diffusion appliance positioned within the space.

FIG. **2** is a perspective view of a liquid diffusion appliance according to the present disclosure.

FIG. **2**a is a perspective view of the liquid diffusion appliance of FIG. **2** with a cover removed.

FIG. **3** is a perspective view of an alternative embodiment of a liquid diffusing appliance according to the present disclosure.

FIG. **3**a is a perspective view of the liquid diffusion appliance of FIG. **3**, with a front cover removed.

FIG. **4** is a chart illustrating operational characteristics of control schemes for diffusing a liquid by a liquid diffusing appliance according to the present disclosure.

FIG. **5** is a chart illustrating the time cycle between time on and time off of the control schemes of FIG. **4**.

FIG. **6** is a chart illustrating the calculated duty cycle of the control schemes of FIG. **4**.

FIG. **7** is a chart illustrating the liquid output of an appliance operating under the control schemes of FIG. **4**.

FIG. **8** is a chart illustrating the expected cartridge life for an appliance operating under the controls schemes of FIG. **4**.

FIG. **9** is a schematic diagram of an enclosed space including a plurality of liquid diffusion appliances according to the present disclosure.

FIG. **10** is a schematic diagram of an enclosed space with air distribution ductwork and a liquid diffusion appliance according to the present disclosure mounted in the ductwork.

FIG. **11** is a schematic diagram of a plurality of enclosed spaces, each with a liquid diffusion appliance according to the present disclosure.

## DETAILED DESCRIPTION

Reference will now be made in detail to exemplary aspects of the present invention which are illustrated in the accompanying drawings. Wherever possible, the same reference numbers will be used throughout the drawings to refer to the same or like parts.

FIG. **1** illustrates a space or room **50** into which it is desired to disperse a liquid for treating the air or other objects within space **50** and an appliance **52** configured to disperse such a liquid. Space **50** is preferably at least semi-enclosed, so that the treatment liquid may be retained within the space to have the desired effect. A completely sealed space is not necessary and it is anticipated that spaces with open entrances and exits may be suitable for treatment according to the present disclosure. For example, a hotel lobby, a building foyer, and a casino floor may have entrances and exits for people accessing the space and may be treated according to the present disclosure. An open air pavilion or an outdoor stadium may be examples of less suitable spaces for treatment according to the present disclosure, as the turnover or exchange of the atmosphere within the space may not permit adequate dwell time for the treatment liquid to accomplish the desired treatment goals. However, it is anticipated that certain types of liquid and treatment regimes may permit use of an appliance according to the present disclosure in these spaces.

While appliance **52** is shown within space **50**, it is anticipated that the appliance need not be physically located within the space. It is necessary that appliance **52** be in fluid communication with space **50** to achieve the treatment of space **50** with airborne diffused liquids, as described herein.

FIGS. **2** and **2**a illustrate a liquid diffusion appliance **100** according to the present disclosure with a cartridge **102** for holding a liquid **104** to be diffused or dispersed within an enclosed space. Appliance **100** may also include a controller **106** which may bed mounted on-board or integrated into appliance **100** as shown. Alternatively, controller **106** may be mounted near to or on an exterior of appliance **100** but not incorporated into appliance **100**. As a further alternative, controller **106** could be remotely located and connected to appliance **100** permitting remote control and operation of appliance **100**. It is anticipated that more than one appliance may

US 7,930,068 B2

**3**

be controlled by the same controller **106** and that the multiple appliances may be mounted in the same or different spaces to be treated.

FIGS. **3** and **3a** illustrate an alternative embodiment of a liquid diffusion appliance **150** according to the present disclosure with a cartridge **152** for holding liquid **104** to be diffused or dispersed within an enclosed space. Appliance **150** is similar in operation and function to appliance **100**. In the following discussion of elements of appliance **100**, it is intended that where appropriate the same discussion may be applied to appliance **150**.

A source **108** of pressurized gas may also be provided within appliance **100**. Source **108** may be an on-board compressor, as shown in FIG. **3**, or may be a connection to an external compressor or other mechanical gas pressurizing device, as indicated by a gas conduit **54** in FIG. **1**. Source **108** may also be a pre-compressed source which needs to be periodically refilled or recharged to a desired pressure.

As is known in conventional liquid diffusion devices, the pressurized gas may serve to draw liquid **104** into a venturi and then separate liquid **104** into smaller particles suitable for airborne dispersion out of appliance **100** into the space to be treated.

Liquid **104** may be a scent to provide a particularly desired odor within the space, such as a pleasing smell in a crowded administrative area. Such odors or scents may be selected from aromatherapy selections to encourage desirable responses among the users of the space to be treated or based on other desired atmospheric conditioning.

Alternatively, liquid **104** may be selected from one of a variety of known aerosol disinfectants or other bio-technical treatment options for providing a desired biological response within the space. Examples of this may be a disinfectant to clear or treat an area of known or suspected pathogens.

Regardless of the nature of the liquid being dispersed within a space, and purpose for which the liquid is being dispersed, for the purposes of this disclosure, it will be assumed that there is a desired density of the liquid to be achieved within the space. This desired density may also be a range of densities, based on the effect sought within the space.

Within appliance **100**, cartridge **102** may incorporate a diffusion means such as a venturi in fluid communication with liquid **104** and through which pressurized gas from source **108** is configured to flow. Flow of gas through the venturi creates a vacuum to draw liquid **104** into the venturi and propel the diffused liquid from the venturi and out of appliance **100** into space **50**. Alternatively, the diffusion means may be a separate component within or mounted adjacent to appliance **100** and not incorporated directly into cartridge **102**. It is anticipated that other diffusion means may be used to separate liquid **104** into suitably small particles and disperse the particles into space **50**. Preferably, the particle size generated by appliance **100** will be approximately in the micron range or smaller. Particles in this size range tend to remain is suspension within the air of the enclosed space until they contact an object, to which they then adhere. The rate of exchange of the air within the treated space will also have an impact on the dwell time that these micron or sub-micron sized particles of liquid have within the enclosed space to be treated.

FIG. **4** illustrates a chart of settings to control the operation of appliance **100** to disperse a desired amount of liquid **104** into space **50**. Each horizontal line in the chart represents a control scheme **110** for controlling the operation of appliance **100**, defining timing of operation of the diffusion means within the appliance and a flow rate of liquid **104** into the diffusion means and into space **50**. Each control scheme may,

**4**

for example, be associated with a particular numerical dial setting or other selectable setting **111** of controller **106**, and in turn, each setting **111** may be defined as suitable for a particular volume **54** of space **50** in which appliance **100** is placed. A standard association of settings **111** to room size or volume **54** may be maintained if the characteristics of liquid **104** are kept consistent despite any different scents or other effects associated with the liquid. If this is done, then for any given room size and for any given liquid, the same setting of controller **106** can be used and liquids may be changed without the need to adjust controller **106**.

Alternatively, an equivalents table may be supplied with a cartridge **102** including a liquid **104** which has significantly different characteristics from a standard or normal liquid. Such a table might be used to provide revised space volumes **54** associated with the respective settings **111** of controller **106**. In the chart of FIG. **4**, a total of forty-eight control schemes **110** associated forty-eight distinct settings **111** of controller **106** are shown. More or fewer settings and/or control schemes **110** may be provided in such a chart or in controller **106** within the scope of the present disclosure.

For each control scheme **110**, a speed setting **112** sets the rate of liquid flow through the appliance when the diffusion means is operating. A time on duration **114** and a time off duration **116** are combined to derive a duty cycle **118**, which is the percentage of time that the diffusion means is operating. In most installations, it may be desirable to not have the diffusion means constantly operating, so that the duty cycle **118** may preferably be less than one. Based on the rate of exchange in the enclosed space, it may be desirable to have appliance cycle on and off to permit particles already dispersed within the space to decay. Only when the rate of dispersion (based on the speed and timing of operation of appliance **100**) is balanced with the rate of decay can the concentration of particles within the enclosed space be controlled within desired limits. Once approach to balancing the dispersion and decay is to cycle the operation of appliance **100** on and off, as indicated in FIG. **4**.

An added benefit of cycling operation of appliance **100** on and off, the concentration of liquid within the enclosed space may be allowed to fluctuate within a range of concentrations. Such a fluctuation may aid in the prevention of scent fatigue or olfactory adaptation that may deaden the ability of persons within the space to perceive the desired affect of the liquid diffused.

It may also be desirable to have a flow rate for each scheme be neither close to the maximum possible flow rate nor close to the minimum flow rate. The speed setting **112** is shown as a percentage of maximum for the diffusion means. Speed setting **112** may be kept within a range of values that corresponds to a preferred or optimal range of values for the operational characteristics of a particular diffusion means. For example, if the diffusion means works most efficiently between 40% and 65% of maximum operational speed, speed setting may be limited to values in this range. For a diffusion means that incorporates a venturi, the flow rate of the liquid may be directly related to the speed or volume of gas that is feed from source **108** through the venturi. In the chart of FIG. **4**, the speed setting is expressed as a percentage of the maximum flow available from gas source **108**.

Within the different control schemes **110** of FIG. **4**, a step wise approach may be indicated in the setting of flow rate or speed. For example, a first group of speed settings from control schemes **110** numbered from 1 to 6, may include the same speed setting **112** corresponding to a desired percentage of maximum gas flow rate. To accommodate different space volumes with the different schemes, the duty cycle for the

US 7,930,068 B2

5

different schemes may be changed. A higher percentage of time-on duration at the same flow rate or speed setting will permit treatment of a larger volume space before the flow rate needs to be altered. In the example of control schemes **1** to **6**, treatment of spaces from 80 cubic feet up to 480 cubic feet may be accomplished with the same flow rate and different duty cycles.

Note that control schemes **42** to **47** include duty cycles of 100% and then vary the flow rate. These settings are for situations where continuous diffusion of liquid **104** is desired or required or when diffusion is controlled along with the air room ventilation rate. As can be seen in a column **120** labeled Cartridge Life, there is a distinctly greater demand for liquid at these diffusion operation levels and cartridges will have to be changed more often to maintain these levels of treatment. It is anticipated that these control schemes are to be used only in special circumstances and will not be commonly used control schemes.

FIGS. **5** to **8** include charts to illustrate different characteristics of control schemes **110** of the chart of FIG. **4**. FIG. **5** shows in graphical form the amount of time on duration and the amount of time off duration for each of the settings of the chart of FIG. **4**. Corresponding to the discussion above, the settings beyond **41** are not shown as those settings **42 47** correspond to fully on operation with varying flow levels.

FIG. **6** illustrates the duty cycle derived from the time on and time off values of FIGS. **4** and **5**, and shows the duty cycle of settings **42** to **47** as 100%. FIG. **7** illustrates a continuous flow rate **122** for each setting **111** and a corresponding average output **124**, taking into account the flow rate **122** and the duty cycle **118** for each setting. FIG. **8** illustrates the impact that each setting will have upon the expected life **120** of a cartridge **104** used in appliance **100** and operating in accordance with one of the control schemes **110**.

The relationships and graphs illustrated in FIGS. **4** to **8** relate to a particular appliance **100** with a particular cartridge **102** having a particular capacity and containing liquid **104** having common diffusion characteristics. The parameters for each setting may be changed or adapted to accommodate desired flow rates or treatment characteristics, or to accommodate different sizes or configurations of spaces to be treated. The numbers associated with each setting are intended to be illustrative only and are not intended to limit the present disclosure to any particular configuration or appliance or space or parameters of operation.

When treatment of the atmosphere within a space is initiated, it may be desirable to provide a more rapid buildup to a desired level or concentration of treatment and then have the appliance transition into a steady-state or maintenance operation. There may be several approaches to accomplishing this sort of rapid build up within the scope of the present disclosure. One of these approaches is to provide for a 100% duty cycle operation for a set period of time to be associated with each of the control schemes. As each control scheme is designated for a particular volume or shape of space, the duration of the 100% duty cycle for each setting could be selected to correspond to that particular space while maintaining the flow rate specified for the associated control scheme. Upon completion of the initiation phase, the appliance would switch to functioning according to the selected control scheme. Similarly, instead of a 100% duty cycle, an increased duty cycle of greater than that specified for a control setting but less than 100% may be used in the initiation phase for that control scheme.

Alternatively, the duty cycle of the setting could be maintained and the control scheme could be associated with a greater flow rate during the initiation phase. For example,

6

referring to FIG. **4**, setting **5** might increase the flow rate from 40% to 65% during initiation. After initiation, the flow rate could be reduced to the 40% normally specified for the control scheme associated with setting **5**.

Some combination of flow rate and duty cycle enhancement may also be used to define an initiation phase, and the initiation phase associated with different control schemes may have different approaches to the use of increased duty cycle or increased flow rate or the combination thereof.

As a further alternative, as shown in FIG. **1**, one or more atmospheric sensors **70** may be included within space **50** and may be used to determine when to exit the initiation phase and move to operation under the selected control scheme for space **50**. In such a configuration, instead of having the initiation phase extend for a set period of time, the initiation phase can be ended with the desired amount of concentration of liquid is in the atmosphere of the space. Of course, a combination of sensing a concentration and operation in the initiation phase for a set period of time may be used as well. Sensor(s) **70** can be used to override/adjust operational parameters of appliance **52**. Different type of sensors **70** can be used as well. By way of example and not limited to these, a sensor **70** may used which detects the concentration of one or more of the chemical components of the liquid or a different sensor **70** may measure carbon dioxide within space **50** as a way of estimating the number of people are in the room. The outputs of such sensors may then be used to alter the operational parameters of the appliance to address the situation within space **50**. Different levels of activity within the same space may demand operational parameters different from those based on a predetermined average level of activity within the space.

Sensors **70** may be used to alter the operation of appliance **52** based on the conditions within space **50**. The alteration to the operation may be to select a different control scheme where the first control scheme used is selected based on the size of the space and the second control scheme is selected based also on the activity within the space. As noted above, the sensor may be used to determine when to transition from a start-up mode of operation to operation under one of the other control schemes. The sensor may be used to determine when an anti-fatigue scheme has achieved the desired alteration of the level of treatment within the space and thus when to return to operation of the appliance according to a different control scheme.

As shown in FIG. **9**, a plurality of appliances **52** may be used to treat space **50** and the individual appliances could be controlled centrally for coordinated operation by a central controller **56**. Alternatively, each of the appliances could be controlled by a local or dedicated controller, such as controller **106**, and operate independently from the other appliances treating the same space. Central controller **56**, or individual controllers **106**, may operate the connected appliance(s) **52** according to control schemes and variations described herein. As a further alternative, one or a plurality of sensors **70** may be used to alter the operation of the appliances **52** from the control schemes, as described herein. Thus, larger or irregularly shaped spaces, or spaces which may have varying amounts of air exchange or activity generating the need for treatment in different areas, can be effectively and efficiently treated using appliances according to the present disclosure.

Because appliances such as appliance **52** may be used to treat larger spaces, it may be desirable to have an auxiliary fan to aid in the distribution of the liquid diffused by the appliance throughout the space **50**. An example of an auxiliary fan **72** for aiding distribution may be a HVAC fan that is part of a forced air heating or cooling installation, such as shown in

-- 14 --

US 7,930,068 B2

**7**

FIG. **10**. Appliance **52** may be positioned within or positioned to diffuse liquid into a supply duct **74** of such an installation and the diffused liquid may be dispersed throughout space **50** whenever fan **72** is operating. In this type of installation, the operation of the auxiliary fan may not controlled by or dependent on the operation of the appliance.

Alternatively, as shown in FIG. **1**, appliance **52** may be installed adjacent a dedicated auxiliary fan **72** to aid in the dispersal of the diffused liquid. In this alternative installation or configuration, auxiliary fan **72** may be controlled in conjunction with the operation of the appliance. Thus, auxiliary fan **72** would only be operated in coordination with liquid diffusion. Auxiliary fan **72** may operate simultaneously with the appliance, may be offset to come on after diffusion has begun and stay after diffusion has been completed for the on portion of the control scheme, or operated in some other arrangement relative to the on portion of the control scheme.

A plurality of appliances **52** may be positioned to each treat a plurality of similarly sized and/or configured spaces, such as banquet rooms, meeting rooms, offices, hotel rooms, etc., such as shown in FIG. **11**. For treatment of such similar spaces **50**, central controller **54** could be used to operate all of the appliances **52** jointly. As an example, these appliances could be connected to a common compressed gas supply **108** and central controller **56** could operate the supply to control diffusion of the liquid from each appliance simultaneously. Or, each appliance **52** could include an independent source of compressed gas, such as an on-board compressor, and central controller **54** could control the supply of power to each of the compressors to control diffusion. In addition, each of these appliances **52** could be located with respect to an auxiliary fan **72** to aid in the dispersion of the liquid being diffused by each appliance.

People who are in the space being treated may become less sensitive to the treatment in the atmosphere of the space or may be fatigued and no longer notice the treatment. This is a common phenomenon, particularly with regard to scents or aromas used to treat the atmosphere, and it may be desirable to provide some degree of variability in the concentration of liquid **104** in the atmosphere. Variations in the concentration above and below the desired level of concentration at some intervals may be used to combat the onset of fatigue to the treatment and enhance the effectiveness of the treatment at the desired level.

In the context of the present disclosure, such anti-fatigue variations may be provided by one or more temporary alterations to the selected control scheme. A first approach might be to reduce the duty cycle to 0% for a set period of time, so that the concentration within the space is allowed to drop below the desired level. At the end of this time, the duty cycle may be returned to the specified value for the control scheme and the concentration allowed to build back to the desired level. Similarly, while decreases in concentration may be more desirable or effective in combating fatigue, the duty cycle might be increased for a period of time above the duty cycle specified for the control scheme to provide an increased concentration in the space. After the period of time, the duty cycle may be reduced to the specified duty cycle of the control scheme and the concentration in the space permitted to return to the desired level.

Alternatively, the flow rate could be reduced below the flow rate of the control scheme to reduce the concentration in the space, or increased above the flow rate of the control scheme to increase the concentration in the space. The alterations to flow rate could be maintained for a period of time and then allowed to return to the flow rate specified for the selected

**8**

control scheme. A combination of variation of flow rate and duty cycle may be used to accomplish the variation in concentration with the space.

The interval between anti-fatigue variations in the operation of the appliance may be fixed by a particular anti-fatigue scheme, or may be randomly variable. A particular anti-fatigue variation scheme may be associated with each control scheme setting of the appliance or a common anti-fatigue variation scheme may be incorporated for use with all settings of the appliance. A fixed anti-fatigue scheme may include variation of the flow rate at certain predetermined intervals, variation in operation of the diffusion means at certain predetermined intervals, or a combination of varying the two parameters according to predetermined patterns. Alternatively, the variation of flow rate and/or operation may be completely on a random basis, with all parameters subject to variation according to a random scheme. This random anti-fatigue scheme may be governed by certain constraints to ensure that the concentration within the space does not exceed or go below certain desired levels.

It should be noted that the periodic operation of the diffusion means within the control schemes according to the present disclosure provide a degree of anti-fatigue function. The periodic operation of the diffusion means will provide at least some degree of variation in the concentration of liquid **104** within space **50** and this variability may reduce the need or desirability of having a more distinct variation as might be created by an anti-fatigue scheme according to the present disclosure.

As mentioned above, use of pauses or periods of non-operation within the control schemes may provide variation on the concentration of liquid within a space that may aid in the avoidance or reduction of fatigue or adaptation. A length of pause may be selected to permits sufficient decay to occur to drop the concentration to a lower level with the space. When the pause is ended, the operation of appliance **100** brings the concentration back up to a higher level. Thus, the pauses inherent in the duty cycle may be used to provide an anti-fatigue effect as well. Even with the same specified duty cycle, the length of each pause may be tailored to permit a greater or lesser degree of decay and thus reduction of concentration. For example, a 25% duty cycle may have pauses of three minutes and operation times of one minute. The same device programmed with pauses of forty-five minutes and operation times of fifteen minutes will have the same calculated duty cycle but will permit a greater degree of concentration variation within the space to the be treated. The length of pause may be selected based on the nature of the liquid being diffused, the number and/or area of surfaces into which particles within the space may contact, and the rate of atmospheric turnover within the space.

Much of the above discussion has suggested a longer term operation of appliance **100** to provide a particular level or concentration of liquid **104** within the atmosphere of the space. However, it is anticipated that appliance **100** could also be configured to operate according to a control scheme for a more discrete period of time or initiated on demand. The operation of appliance **100** might be initiated in reaction to an event within the space and only operate for the expected duration needed to respond to the event. For example, if space **50** is a hotel lobby, and liquid **104** is a disinfecting agent, appliance **100** may be configured to function in the early morning hours to provide an effective concentration of liquid **104** within space **50**. This may be the time of least movement through the space and may ensure the most uniform treatment of the atmosphere and surfaces within the space. Treatment during the day or in times of heavy traffic may not be as

-- 15 --

A041

US 7,930,068 B2

9

desirable or effective. Alternatively, appliance **100** may be used to place a concentration of a scent into a meeting room space in anticipation of a scheduled meeting but may not need operate during the meeting.

While the invention has been described with reference to preferred embodiments, it is to be understood that the invention is not intended to be limited to the specific embodiments set forth above. Thus, it is recognized that those skilled in the art will appreciate that certain substitutions, alterations, modifications, and omissions may be made without departing from the spirit or intent of the invention. Accordingly, the foregoing description is meant to be exemplary only, the invention is to be taken as including all reasonable equivalents to the subject matter of the invention, and should not limit the scope of the invention set forth in the following claims.

What is claimed is:

**1**. A method of controlling a liquid diffusion appliance comprising:

providing an enclosed space to be treated by a liquid and with which the appliance is in fluid communication, the appliance including a reservoir of liquid and a means of diffusing the liquid into the air of the space;

providing a plurality of control schemes for the appliance which based on characteristics of the liquid and a level of treatment desired for the space, each of the control schemes specifying operational parameters for the appliance including a flow rate of liquid, and a periodic timing of operation of the diffusion means;

providing the diffusion means including a venturi in fluid communication with the liquid reservoir, and the venturi in fluid communication with a source of compressed gas, and wherein operation of the diffusion means comprises release of the pressurized gas into the venturi, the release of the gas into the venturi operating to draw liquid from the reservoir into the venturi where the liquid mixes with the gas at the desired flow rate and then dispersing the gas and liquid mixture into the space;

determining a volume of the space to be treated; and

selecting one of the control schemes based on the volume of the space to be treated;

operating the appliance based on the selected control scheme.

**2**. The method of claim **1**, further comprising;

providing a plurality of initiation of treatment schemes, each of these initiation schemes adapted to accelerate diffusion of liquid to the desired level of treatment in the space and each initiation scheme associated with at least one of the control schemes, each initiation scheme defining liquid flow rate and operation of the diffusion means;

selecting the initiation scheme associated with the selected control scheme; and

operating the appliance based on the initiation scheme before operating the appliance based on the control scheme.

**3**. The method of claim **1**, wherein at least one of the control schemes include an anti-fatigue scheme which includes a predetermined periodic variation in flow rate.

**4**. The method of claim **1**, wherein at least one of the control schemes include an anti-fatigue scheme which includes a predetermined periodic variation in operation of the diffusion means.

**5**. The method of claim **1**, wherein at least one of the control schemes include an anti-fatigue scheme which includes variation of the flow rate and operation of the diffusion means at predetermined intervals.

10

**6**. The method of claim **1**, wherein at least one of the control schemes include an anti-fatigue scheme which includes variation of the flow rate at random intervals.

**7**. The method of claim **1**, wherein at least one of the control schemes include an anti-fatigue scheme which includes variation of the operation of the diffusion means at random intervals.

**8**. The method of claim **1**, wherein at least one of the control schemes include an anti-fatigue scheme which includes variation of the flow rate and operation of the diffusion means at random intervals.

**9**. The method of claim **1**, wherein the flow rate for any of the plurality of control schemes is selected to permit intermittent operation of the diffusion means to provide the desired level of treatment within the space.

**10**. The method of claim **1**, wherein a length of pause in the periodic operation of the diffusion means for at least one of the control schemes is selected to permit the level of treatment within the space to drop below the desired level of treatment and a length of operation of the diffusion means is selected to return the level of treatment to the desired level of treatment.

**11**. The method of claim **1**, wherein a length of pause in the periodic operation of the diffusion means for at least one of the control schemes is selected so that the level of treatment within the space stays substantially constant and near the desired level of treatment.

**12**. The method of claim **1**, wherein the source of pressurized gas is a compressor, and the operation of the diffusion means includes operating the compressor to release pressurized gas to the venturi.

**13**. The method of claim **12**, wherein the compressor is incorporated into the appliance.

**14**. The method of claim **1**, wherein the source of pressurized gas is a precompressed source and the operation of the diffusion means includes permitting gas from the precompressed source to flow into the venturi.

**15**. The method of claim **1**, wherein the liquid in the reservoir is a scent.

**16**. The method of claim **1**, wherein the liquid in the reservoir is a disinfectant.

**17**. The method of claim **1**, wherein the liquid in the reservoir is a bio-technical treatment.

**18**. The method of claim **1**, further comprising:

providing an atmospheric sensor positioned within the space operatively connected to the appliance; and

adjusting the operational parameters of the appliance based on signals from the atmospheric sensor relating to the desired level of treatment within the space.

**19**. The method of claim **1**, further comprising a plurality of appliances treating the enclosed space and operating each of the appliances according to the selected control scheme.

**20**. The method of claim **1**, further comprising a plurality of appliances each positioned to treat a portion of the enclosed space, selecting a control scheme for each appliance based on the portion of the enclosed space that appliance is treating, and operating each appliance according to a control scheme selected for that appliance.

**21**. The method of claim **1**, further comprising a plurality of appliances treating a plurality of enclosed spaces and operating each appliance based on the selected control scheme.

**22**. The method of claim **1**, further comprising an auxiliary fan positioned to disperse the liquid diffused by the appliance.

**23**. The method of claim **22**, further comprising operating the auxiliary fan in coordination of the operation of the appliance according to the selected control scheme.

**24**. A system for treating an enclosed space with a liquid, the system comprising:

-- 16 --

US 7,930,068 B2

**11**

an appliance with a diffusion means in fluid communication with the space and also connected to a liquid reservoir containing the liquid to be dispersed;

the diffusion means including a venturi in fluid communication with the liquid reservoir, and the venturi in fluid communication with a source of compressed gas, and wherein operation of the diffusion means comprises release of the pressurized gas into the venturi, the release of the gas into the venturi operating to draw liquid from the reservoir into the venturi where the liquid mixes with the gas at a desired flow rate and the dispersing the gas and liquid mixture into the space; and,

a controller connected to the appliance, the controller including a plurality of control schemes for dispersion of the liquid into the space, each control scheme defining operational parameters for the appliance including a periodic operation of the diffusion means and the flow rate of liquid from the reservoir through the diffusion means, each of the control schemes corresponding to a particular volume within the space.

**25**. The system of claim **24**, further comprising each control scheme associated with an initiation control scheme, the initiation control scheme defining a constant operation of the diffusion means at the flow rate of the associated control scheme for a fixed period of time, and wherein upon the selection of an initiation function the appliance will diffuse the liquid according to the initiation control scheme and then the appliance will diffuse liquid according to the selected control scheme.

**26**. The system of claim **24**, further comprising each control scheme associated with an anti-fatigue control scheme, the anti-fatigue control scheme defining a variation in the

**12**

periodic operation of the diffusion means of the associated control scheme at predetermined intervals.

**27**. The system of claim **24**, further comprising each control scheme associated with an anti-fatigue control scheme, the anti-fatigue control scheme defining a variation in the periodic operation of the diffusion means of the associated control scheme at random intervals.

**28**. The system of claim **24**, further comprising each control scheme associated with an anti-fatigue control scheme, the anti-fatigue control scheme defining a variation in the flow rate of the associated control scheme at predetermined intervals.

**29**. The system of claim **24**, further comprising each control scheme associated with an anti-fatigue control scheme, the anti-fatigue control scheme defining a variation in the flow rate of the associated control scheme at random intervals.

**30**. The system of claim **24**, further comprising:

a sensor operatively connected to the controller, wherein the controller may adjust the operational parameters of the appliance based on signals from the sensor related to the conditions within the space.

**31**. The system of claim **24**, further comprising a plurality of appliances each operated by the controller.

**32**. The system of claim **24**, further comprising a plurality of appliances, each appliance operated by one of a plurality of controllers.

**33**. The system of claim **24**, further comprising an auxiliary fan positioned to disperse the liquid diffused by the appliance into the enclosed space.

* * * * *

**CERTIFICATE OF SERVICE**

I certify that on January 14, 2015, this Brief was filed electronically using

the CM/ECF system and served via the CM/ECF system on registered counsel.


_/s/Donna Stockton_____

## CERTIFICATE OF COMPLIANCE

I certify that based on the processing software used to create this Brief of

Appellant, the word count is 8504.


January 14, 2015                    Respectfully submitted,

                                     /s/Erika H. Arner